CHICAGO (GARRISON v.). See Case No. 5,255.

CHICAGO (GOODRICH v.). See Case No. 5,542.

CHICAGO (LOMBARD v.). See Case No. 8,470.

CHICAGO (NICHOLSON v.). See Case No. 10,248.

CHICAGO (NORTHERN TRANSP. CO. v.). See Case No. 10,324.

CHICAGO (SCOTT v.). See Case No. 12,526.

CHICAGO (STOW v.). See Case No. 13,512.

CHICAGO (UNION NAT. BANK v.). See Case No. 14,374.

CHICAGO, A. & St. L. R. CO. (DENNISTON v.). See Case No. 3,800.

CHICAGO & A. R. CO. (BARLEY v.). See Case No. 997.

CHICAGO & A. R. CO. (ILLINOIS v.). See Case No. 7,006.

CHICAGO & A. R. Co. (JESSUP v.). See Case No. 7,300.

---

## Case No. 2,665.

CHICAGO & N. W. R. CO. v. CHICAGO & P. R. CO.

[6 Biss. 219; 7 Chi. Leg. News, 57; 9 Am. Law Rev. 362; 22 Pittsb. Leg. J. 74; 6 Leg. Gaz. 386.] [1]

Circuit Court, N. D. Illinois.   Oct., 1874.

RAILROAD CROSSING AT GRADE—JURISDICTION.

1. Where the state legislature has not prescribed in what manner one railroad shall cross another, a court of equity has jurisdiction in a proper case, to control the matter.

2. In Illinois the policy of state legislation is to allow a new railroad, in most instances, to cross another road at grade; but if a new road can at small expense, cross the old one at a different level, a court of equity should require it to do so, especially if a grade crossing is dangerous to life and property.

3. The additional expense may, however, be apportioned between the roads, as in such case the old road has no vested absolute rights to control the new.

4. A corporation created by the laws of another state, although associated with one of this state, and having common interest with it, is entitled to file a bill in this court and claim its protection.

[Distinguished in Chicago & W. I. R. Co. v. Lake Shore & M. S. Ry. Co., 5 Fed. 22; Horne v. Boston & M. R. R., 18 Fed. 51. Cited in Burger v. Grand Rapids & I. R. Co., 22 Fed. 562.]

[2] [A bill in chancery was filed in the United States circuit court, alleging that the complainant was a corporation organized and

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. The statement is taken from 7 Chi. Leg. News, 57, 22 Pittsb. Leg. J. 74, and 9 Am. Law Rev. 362, contain only partial reports.]

[2] [From 7 Chi. Leg. News, 57.]

existing under the laws of the state of Wisconsin, and a citizen of that state, and that there was also a corporation of the same name organized and existing as a corporation under the laws of the state of Illinois; that by a certain agreement heretofore entered into between said respective corporations, commonly called articles of consolidation, the said two corporations became and still are the joint owners of all of the lines of railroad in the states of Illinois and Wisconsin, formerly owned by the companies separately, including a certain line of railroad from Chicago to Freeport; that the Chicago & Pacific Railroad Company were engaged in constructing a line of railroad from Chicago to the Mississippi river, which had been so located as to cross the complainant's road a few miles west of Elgin, and was now being constructed on that route; that at the proposed crossing point the grade of the Northwestern Railway was 24 feet to the mile, and on a curve, and from thence north the line passed through a deep cut 1,000 feet long, so that a train approaching the crossing from the west would be entirely out of sight of trains approaching on the Pacific Railroad; that it would at all times be difficult, and with a slippery track impossible, to stop a heavy freight train approaching the crossing on the down grade; that, as all trains were required by law to stop before crossing, the capacity of the entire Freeport line would be lessened to the extent of at least five loaded freight cars to each train, as this was the heaviest grade upon the whole road, and a locomotive could not haul as heavy a train, by five cars, if it was obliged to stop at the crossing and start again on the up grade.

[It was further alleged that under an agreement between the two companies a route for an elevated crossing, where the Pacific Railroad could pass over the Northwestern by bridge, had been surveyed by the engineers of both roads and was only some 500 feet distant from the proposed point of crossing, and would cost only about $13,000 more to construct than the proposed route; that this route was perfectly safe and feasible, and is the one that ought to be adopted; that the proposed route would make a crossing that would always be exceedingly dangerous and difficult, and materially lessen the capacity of the whole line from Chicago to Freeport, and materially impair its usefulness. The bill then prayed that the Chicago & Pacific Railroad Company be enjoined from making the proposed crossing. A large number of affidavits were filed with the bill, accompanied by plats and profiles showing the proposed crossing at grade, and also the surveyed route for the over crossing, and the gradients of the respective routes.

[The Chicago & Pacific Railroad Company filed several affidavits, in which they alleged that proceedings had been instituted in Kane county under the eminent domain act, to condemn a right of way on the proposed route, and those proceedings were now pending. They also denied that any agreement had ever been made as to the over crossing. They also alleged that the Pacific road was now being operated from Chicago to Elgin, and that the grading and bridging was finished from Elgin to a point 40 miles west; that the ties and iron were all on hand and ready to be laid on this 40 miles, and if it was prevented from making the crossing the line could not be built this year; also, alleging that the bill was filed simply to delay the building of the Pacific Railroad, which was alleged to be a competing line.

[The case was opened on the part of the Northwestern Company by B. C. Cook, general solicitor of the company, who made a full statement of the case, and claimed that under the facts, as shown by the bill and affidavits, the law would not allow the Chicago &.Pacific Company to cross the Northwestern Railroad at grade, but would compel it to make an over crossing. The over crossing could be made in the immediate vicinity by a safe and feasible route, and at an expense of only $13,000 in excess of the proposed route. This expense was inconsiderable, in view of the danger of the crossing at grade, and the material injury which such crossing would inflict upon the Northwestern, by diminishing the capacity of the entire line to the extent of five loaded cars to each freight train.

[The defendant was represented by its attorney, John S. Wilcox, of Elgin, and B. F. Ayer, of Chicago.

[Mr. Ayer relied mainly upon objections to the jurisdiction of the court: First, that the United States court had no jurisdiction of the parties; second, that chancery had no jurisdiction of the subject matter.

[In support of the first proposition, he contended that the bill showed that the C. & N. W. Railway was a consolidated corporation of the states of Illinois and Wisconsin, and therefore a citizen of each of those states; that the corporation, as a citizen of Wisconsin and Illinois, could not bring a suit against a citizen of Illinois in the United States court; citing Bank v. Deveaux, 5 Cranch [9 U. S.] 61; Louisville R. R. v. Letsan, 2 How. [43 U. S.] 497; Marshall v. Baltimore & O. R. R., 16 How. [57 U. S.] 314; Ohio & M. R. R. v. Wheeler, 1 Black [66 U. S.] 286; Baltimore & O. R. R. v. Harris, 12 Wall. [79 U. S.] 65; Chicago & N. W. R. R. v. Whiton, 13 Wall. [80 U. S.] 270.

[Second, that a court of chancery had no jurisdiction of the subject matter. Mr. Ayer cited section 10 of the charter of the Chicago & Pacific Company, which authorized that company to cross any railroad, highway or water-course on its line, provided it should restore the same so as not to materially impair the usefulness of the railroad, highway or water-course so crossed.

He also cited the eminent domain act as providing the method by which right of way should be obtained in case the parties could not agree. He then contended that as proceedings had been commenced under the eminent domain act, in the circuit court of Kane county, that court had by law exclusive jurisdiction of the controversy.

[Mr. Wilcox also insisted that the circuit court of Kane county had sole jurisdiction, because the charter of the Pacific road authorized it to cross the Northwestern; and the eminent domain law provided a method for the assessment of damages, if the Northwestern should be damaged by the crossing. He also insisted that the bill and affidavits did not make out a case for the interposition of a court of equity; that the bill was filed to delay the construction of the Chicago & Pacific, and not because the crossing was a dangerous one; also that, if the Pacific road was prevented from crossing at grade, the over crossing was so expensive as to seriously delay its construction, and that the over crossing would be difficult to maintain and operate.

[Geo. C. Campbell concluded the argument on the part of the Northwestern Railway Company. The points made were as follows: First. The United States court had jurisdiction of the parties. Second. A court of chancery has jurisdiction of the subject matter. Third. The facts of this case call for the interposition of the court to prevent defendant from making the crossing at a point where there will be continual danger to life and property.

[In support of the first point, Mr. Campbell relied upon the cases cited by Mr. Ayer. In the Case of Wheeler, in 1 Black, 286, the supreme court of the United States had held that a corporation could not be formed under concurrent laws of two different states, but would exist as a separate legal entity in each state. In the Harris Case, 12 Wall. [79 U. S.] 65, this opinion was modified so far as to admit that an amalgamated corporation could exist under the laws of several states, but in such case the separate legal existence of the different corporations was not terminated. They existed, rather, as joint owners of the property, and, as the supreme court said in the case cited, "The jurisdictional effect of the existence of such a corporation, as regards the federal courts, is the same as that of a co-partnership of individual citizens residing in different states." This was conclusive upon the question of jurisdiction of the federal courts. The Case of Whiton, cited from 13 Wall. [80 U. S.] 270, was further confirmation of the rule, for there the supreme court of the United States held that this very corporation, the C. & N. W. R., was, notwithstanding the acts of consolidation, still two distinct legal entities,—one by the laws of Wisconsin, and one by the laws of Illinois. The question here was simply whether one joint owner, being a citizen of Wisconsin, had the right to invoke the aid of the federal court to protect the common property.

[Second. As to the jurisdiction of a court of chancery. Mr. Campbell contended that this court had exclusive jurisdiction of a controversy like the one at bar, and cited the railway act of 1871–72, § 15 (Myers' Laws, p. 70), which provides that one railroad shall have the right to cross any other railroad, and enacts that "if the corporations cannot agree upon the amount of compensation to be made therefor, or the points and manner of crossing, the same shall be ascertained and determined in manner prescribed by law." The controversy in this case was as to the point and manner of crossing. There was no statutory proceeding under which such a dispute could be settled, and no common law action in which it could be settled. Hence, there was absolutely no remedy at law, and that would give a court of chancery jurisdiction. Defendants claimed that the eminent domain act afforded a remedy, but it did not. The act provided a method of taking private property only. But the right of way of a railroad was not private property; it was acquired under the eminent domain act for public use, and was held for public use. That property held for one public use could not, under a general law providing for the condemnation of private property, be taken from the first use, and subjected to another public use. This rule had been laid down in Massachusetts, California, and New York. Boston & A. R. Case, 53 N. Y. 578. If conceded that the aid of the eminent domain act could be invoked at all, it did not meet this case, as it would only provide a method of determining the compensation to be paid by one road to the other. There was no dispute here as to compensation. The dispute was "as to the point and manner of crossing." Eminent domain law provided no method of settling that dispute. The bill alleges and the affidavits prove that the proposed crossing would be continually dangerous to life and property. Can it be supposed that the legislature intended that the Pacific road should institute proceedings under the eminent domain law, and have a jury determine what sum should be paid to the C. & N. W. Railway in order that it should be entitled to construct and maintain a crossing which should be forever fraught with danger to life and property? Yet the whole act will be searched in vain for authority to settle any dispute except as to compensation. It is equally plain that no common law action will afford a remedy, but the statute contemplates a dispute "as to point and manner of crossing," and enacts that it shall be settled as provided by law. It does not grant to the new railroad the right to choose for itself the point and manner of crossing, and merely have the compensation fixed by law. The

conclusion is irresistible that chancery alone has jurisdiction to settle all disputes as to "point and manner of crossing."

[Third. Upon the facts in this case, defendant has no right by law to cross at grades, but must make an over crossing.   Section 10 of the charter of the Pacific Railroad gives it the right to cross any railroad on the line of its route, provided "the said railroad shall restore the railroad thus intersected or crossed to its former state, or in a sufficient manner, not materially to impair its usefulness."   The bill alleges and the affidavits show that the proposed crossing will materially impair the usefulness of the Northwestern road, as it will diminish the capacity of the entire road to the extent of five loaded cars per train, and also make it dangerous to life and property.   This being the fact, it is not a question as to how much it will cost to make an over crossing, but such a crossing must be made if the evil cannot be avoided in any other way.   This is precisely the rule in Chicago, B. & Q. R. Co. v. Payne, 59 Ill. 540.   This was a case arising under section 24 of the railway act of 1849, which is, word for word, the same as section 10 of the charter of the Chicago & Pacific R. R.   Mr. Justice McAllister, in delivering the opinion of the court, says: "The company was under the statutory duty to restore the highway to its former state, or in a sufficient manner not to impair its usefulness. The peril of crossing could have been avoided by the railway going under the highway, or, in other words, constructing the highway over the railway.   If the highway could be restored in a manner not to impair its usefulness only in that way, it was the duty of the company so to restore it."] [2]

DRUMMOND, Circuit Judge.  The question involved in this case is one of great importance, both as to the rights of railroads and those of the public.  I am inclined to think that, under certain circumstances, an application may be made to a court of equity for the purpose of controlling, to some extent, the right of one railroad to cross another.  If the legislature of the state has prescribed in what manner one railroad shall cross another, it may be that it would control all parties and the courts; but where the legislature has not declared in what particular way one railroad shall cross or intersect another, but has only referred to it in general terms, then, I think, within the true meaning of the act of the legislature, it may be competent for a court of equity to control the railroads as to the crossings. In this state, it may be said, in one sense, to be the policy of the state to allow a new railroad to cross the track of an old railroad, and at grade, in most instances. At the same time, the legislature has shown clearly

[2] [From 7 Chi. Leg. News, 57.]
5FED CAS.—38

enough that it does not intend that a railroad shall cross at grade in all instances, otherwise it would have been so stated.  For the reason that I mentioned before, it is not likely the legislature ever will say so, because the topography of the particular locality where the crossing is to be made—indeed, various circumstances—control and determine how the crossing shall be made. For example, where two railroads are approaching each other, through a comparatively level country, and one is to cross the other, it may be said that, in such a case as that, ordinarily, the new railroad would have the right to cross the other at grade; not that it is universally true, but generally so. There might be, and often are, circumstances where it would not be consistent with the interests of the railroads themselves or of the public that they should cross at grade.

Now in this case, assuming that the facts are as stated, and that the new railroad (the Chicago & Pacific Railroad) can cross over the old railroad at so little expense as is stated, I should consider it the duty of a court of equity to require it to be done. If the old road comes into a court of equity and asks that the crossing should be so made, and there is an additional expense incurred in consequence, it may be competent for a court to say the expense shall not be wholly incurred by the new railroad company, because I adhere to the doctrine I laid down the other day in the Michigan Central and Baltimore & Ohio Case, that the fact that one railroad has been constructed does not give it any absolute rights, except so far as the question of mere property is concerned, over a new railroad. It takes its rights always subject to the power of the state to authorize any other railroad to cross or intersect it, as the case may be. Where there is a considerable expense growing out of the crossing, it may be a question for a court of equity to determine how that expense shall be apportioned.

In this particular case, assuming that the allegations of the bill are sustained by the affidavits, then it seems clear that it is for the interests of both roads that one should cross over the other. It is not a question for a day, a month, or a year; but it is a question for all time, so to speak, at any rate, for an indefinite time. The crossing of a road at grade involves a continual, never-ending expense and damage to both roads. It can be avoided by one crossing over the other, and the only expense then is the interest on the additional cost.

Now, in this case it is said that there is quite a steep grade; that one of the circumstances connected with the crossing at grade, namely, the stoppage of the trains, involves a peculiar loss and danger.  In such a case as that, it certainly may be competent for a court of equity to interfere, under the provisions of law as they now exist.  The

mere question of damages to be ascertained by the exercise of the right of eminent domain does not reach the difficulty; therefore it may be a proper case for the interposition of a court of equity, even though the court under other circumstances, would not interfere, as in the case supposed, of two railroads in a level country, where they approach under such circumstances that the natural crossing may be at grade. Here it is not so.

If there is any additional expense involved in this to the new road, I do not say that expenditure would have to be incurred exclusively by that road. I should be very much inclined to apportion the expense under the circumstances of the case, because the old railroad comes in and asks for the interposition of a court of equity, and under the equity rule, might be required to bear its proper share of the expense, because the crossing at the elevation is ·for the common advantage of both roads.

I think this a proper case for the interposition of a court of equity. I am more and more inclined to hold that it is the duty of a court of equity to interfere in cases of this kind unless the legislature has unmistakably declared what the rule is. If the legislature comes in and says all crossings shall be located in a particular way, as a police matter, we will submit. But so long as they have left it open, I am inclined to hold that a court of equity can protect and assert the rights of railroads—the old and the new—and those of the public.

As to the question of jurisdiction, it is perhaps not entirely free from doubt. But I think that for the purpose of a standing in the federal court, within the language of the constitution and the judiciary act, we must hold that a corporation created by the laws of another state, although it may be associated with a corporation in our own state, and their interests may be common, will be recognized as being within the jurisdiction of this court; that a court of equity can protect the interests of a joint proprietor in property that is being injuriously affected. That is my present impression. Let the injunction issue pursuant to the prayer of the bill.

━━━━━

CHICAGO & N. W. RY. CO. (MENZELL v.). See Case No. 9,429.

CHICAGO & N. W. RY. CO. (PIEK v.). See Case No. 11,138.

CHICAGO & N. W. R. CO. (SAYLES v.). See Cases Nos. 12,414 and 12,415.

CHICAGO & N. W. R. CO. (WHITON v.). See Case No. 17,597.

CHICAGO & P. R. CO. (CHICAGO & N. W. R. CO. v.). See Case No. 2,665.

CHICAGO & S. R. CO. (SMYTHE v.). See Case No. 13,135.