[No. 863.   Decided August 9, 1893.]

# SEATTLE AND MONTANA RAILWAY COMPANY, *Respondent*, v. THE STATE OF WASHINGTON *et al.*, *Appellants*.

EMINENT DOMAIN — APPROPRIATION OF STATE LANDS — INTERSECT-
ING RAILWAYS — APPROPRIATION OF CROSSINGS — MUNICIPAL
CORPORATIONS — STREETS ON TIDE LANDS.

Tide lands belonging to the state cannot be taken under the em-
inent domain act, as applied to railroads (Gen. Stat., §§1569, 1570;
Code Proc., title 9, ch. 5), for the reason that such act has regard
only to the taking of private, and not public, property.

The act authorizing a city of the first class (Laws, 1889–90, p. 223,
§5, subd. 37), "to project or extend its streets over and across any
tide lands within its corporate limits, and along or across the har-
bor areas of such city," does not empower such city to lay out over
the tide lands of the state a street which is not an extension of any
of the existing streets of the city.

Where a railway in process of construction crosses or paral-
lels an existing railway, it must accommodate itself to the estab-
lished way of the latter, and cannot be so constructed as to overlap
the existing tracks or right-of-way longitudinally, so that either
track cannot be operated when the other is in use.

Under §1571, Gen. Stat., providing that if two railroad corpora-
tions cannot agree upon the point and manner of railroad crossings,
the same shall be ascertained and determined in the manner pro-
vided by law for the taking of lands, and under §651, Code Proc.,
providing that if, at the time and place appointed for the hearing
of the petition, the court shall be satisfied by competent proof that
the land or other property sought to be appropriated is required
and necessary for the purposes of such enterprise, an intersecting
railroad cannot determine for itself the point and manner of its
crossing another road, but the necessity therefor is a matter for ad-
judication by the court.

An intersecting railroad should attempt to agree with the road
crossed upon the point and manner of crossing and compensation
therefor, before seeking the interposition of a court in proceedings
to appropriate a right-of-way.

It is not error for one of the judges of the superior court of a
county, charged by rule of court with the examination of equity
cases, before whom a cause is on trial, to deny a motion for the
transfer of the cause to another judge for the purpose of a jury trial
upon one branch of the case.

A railroad seeking by condemnation proceedings to appropriate a right-of-way for crossing the tracks of another railroad may, by stipulation tendered, assume the burden of maintaining frogs and crossing apparatus.

*Appeal from Superior Court, King County.*

*W. C. Jones*, Attorney General, *James A. Haight, Ashton & Chapman*, and *Andrew F. Burleigh*, for appellants.

*Burke, Shepard & Woods*, for respondent.

The opinion of the court was delivered by

STILES, J. — This was a proceeding for the condemnation of a right-of-way for respondent's railroad, and involves three different appellants: the state, the Columbia & Puget Sound Railroad Company, and the Northern Pacific Railroad Company. The right-of-way sought to be appropriated lies over land between the high and low water marks in Elliott Bay, on the water front of the city of Seattle.

1. The state appeared by the attorney general, and moved to dismiss the proceeding as against it, on the ground that the court had no jurisdiction to entertain it, which motion was denied. We think the court erred in its ruling on this point, for the following reasons:  The state is the owner of this land, and there is no authority, either express or implied, in the statutes for the taking of any part of it through exercise of the power of eminent domain. Our eminent domain act, as applied to railroads (Gen. Stat., §§1569–70; Code Proc., title 9, chap. 5), must be construed, as are all such acts, as having regard only to the taking of private property, unless there is either express or clearly implied authority to extend them further.  Lewis, Em. Dom., § 273; *State v. Anthoine*, 40 Me. 435; *Marblehead v. Commissioners*, 5 Gray, 451; *Charlestown v. Commissioners*, 3 Metc. 202; *Stevens v. Erie Ry. Co.*, 21 N. J. Eq. 259.

The respondent, we believe, concedes thus much, but it

claims to avoid the force of it by citing that portion of Code Proc., § 649, providing for service of notice in condemnation cases, which reads as follows:

"In case the land, real estate, premises, or other property sought to be appropriated is *state*, school or county land, the notice shall be served on the auditor of the county in which the land  .  .  .  is situated."

Tide lands are "state" lands in a certain sense — that is, they belong to the state; but in all the nomenclature of our constitution and statutes the latter term does not include the former.  Articles 15 and 17 of the constitution treat of tide lands, while article 16 is devoted to school and granted or state lands.  Chapter 7, Gen. Stat., provided for a "state land commission," to whose supervision "all public lands now owned by or the title to which may hereafter vest in the state" was committed.  But this sweeping term, "public lands," did not include school lands, tide lands, the harbor areas, the capitol grounds, nor any of the lands upon which the public institutions of the state are located, all of which are committed to the supervision of other boards or officers.  As well might it be contended that because a railroad is authorized to enter upon and condemn "any" land for its tracks, depots, shops, round houses, etc., it could, by serving notice upon the auditor of Thurston county, take the entire ten acres upon which the state capitol stands for a depot and shops.

Thus much for construction of the term "state lands." But it would seem that the legislature, in expressly conferring upon railroad companies the right to construct their lines "across, along, or upon any river, stream of water, watercourse,  .  .  .  which the route of such railway shall intersect or touch" (Gen. Stat., § 1572), had gone as far as it intended in this direction.  True, this law was passed in 1888 (Laws, p. 64, § 3), when the territorial legislature had not full, or perhaps any, jurisdiction over

such lands as that in question; but no change has been made in the law, and we can only interpret it as we find it. What it meant then it means now; the change in the conditions from territorial times to the present has not changed the meaning or intent of the statute.

The argument from convenience is strongly urged upon us, and it is said that unless tide lands are thus subject to condemnation, much embarrassment will ensue to the building of railroads, because the situation of the land in many places, and particularly at this place, is such that no land is available for tracks and railway terminal facilities except along the shores of tide waters and upon the tide flats. The State of Washington, by its constitution, has taken an advanced and decided position with regard to navigable waters and the lands beneath them; a position which is scarcely anywhere paralleled by the written law. It proposes to determine for itself what shall be the disposition of these lands, and how the facilities for transportation upon, to and from its great natural water highways shall be managed and enjoyed. It will, doubtless, encourage and invite the building of railways so as to take advantage of these lands and waters; but it proposes to say how that shall be done, and when and by whom. All railways built upon its tide lands, and all which may be built there, until it shall have provided for them by law, will be there at sufferance, subject to be removed or re-arranged as the legislature, subject to the constitution, may ordain. It has harbor lines to lay in front of the city of Seattle, which must be inviolate, and the lands between which must be inalienable, except as the constitution permits; and it has its own policy, as announced in legislation already enacted, concerning the disposal of the other tide lands.

2. The disposition of the case is, at this point, complicated with another matter, viz., the fact that the place over which this condemnation was sought was within what is

known as "Railroad avenue," a street laid out by the city council of Seattle, in 1889, before the adoption of the constitution, and perpetuated in the freeholders' charter of 1890.

The court below held that, inasmuch as this was a street authorized to be laid out by the constitution and statutes of the state, the state, although a proper and necessary party to this proceeding, was not entitled to any consideration in the assessment of damages for the laying of the railroad along the street.    We are unable to see why the state, as owner of the fee and of lands abutting on both sides of the street, should not be entitled to damages for the occupation of the street for ordinary railroad purposes, even conceding this to be a lawful street, unless we were to adopt the theory that such occupation is not an additional burden for which the abutting owner may claim damages, a theory which could hardly stand under our constitutional provisions against the taking or damaging of property without compensation, as the state would certainly be entitled to rank as a private owner in such a case. *Hatch v. Tacoma, etc., R. R. Co.*, 6 Wash. 1 (32 Pac. Rep. 1063).    Neither the constitution nor the statute assumes to confer the fee of any tide lands for streets; an easement only is given.

The court's ruling last referred to, however, would not cut an important figure in this case, in view of a dismissal as to the state.    But the main question is left, whether Railroad avenue has any legal existence, and this question vitally concerns the other parties to the proceeding.

This street was declared to be a public street of the city immediately after the fire of 1889, when all of the ground covered by it was free from buildings or other structures, and it has been kept free ever since, although it occupies some of the space where such structures formerly stood. It begins at a point on the northeasterly shore of Elliott

bay, and skirts the bay for several miles, much in the form of the letter U.    It does not touch the upland at any point except where it begins, but keeps mostly within the low tide line until it passes south of King street, where the land recedes to the south and east, forming a large inner bay, which the street crosses.    It is 120 feet wide, and is not the extension of any city street.    While it was laid out as, and declared to be, a public street, its real purpose was undoubtedly to afford an open space for the use of railroads, and its entire width, except space for sidewalks, has been covered by specific grants to railroad companies of a certain number of feet each.    When fully occupied, in accordance with the terms of these charters, the public will have no practical enjoyment of any part of it except at street crossings.

Ordinarily a city has no power to take land merely for the purpose of furnishing a railroad company with a right-of-way.    Railroad companies are endowed with the same power of eminent domain which cities have, to enable them to take care of themselves.    Neither corporation can make use of its power to condemn land for the use of the other. *Chicago, etc., Ry. Co. v. Galt*, 133 Ill. 657 (23 N. E. Rep. 425); *Ligare v. Chicago*, 139 Ill. 46 (28 N. E. Rep. 934). But the application of this rule to the present case may not be admitted, inasmuch as this street was not procured by condemnation.

Waiving the fact that the ordinance establishing Railroad avenue at the place in controversy was passed in July, 1889, when the city of Seattle had no jurisdiction to extend streets over tide lands, we shall treat the declarations of the charter of 1890 as, in all respects, a formally sufficient exercise of the authority conferred upon cities to extend streets over tide lands, even if the ordinance obtained no force at the adoption of the constitution.

The article of the constitution on harbors and tide

waters (15), after providing for the reservation of an outer harbor area not less than fifty nor more than six hundred feet wide along the water front of all incorporated cities "for landings, wharves, streets and other conveniences of navigation and commerce," and further providing for the leasing of rights to build structures in aid of commerce upon the harbor areas, contains this language:

"SEC. 3. Municipal corporations shall have the right to extend their streets over intervening tide lands to and across the area reserved as herein provided."

This provision is claimed to be self-executing, though it would seem that such a construction might be very embarrassing when the matter of the disposal of the inner tide lands comes up (that matter being committed entirely to the control of the legislature), since the state's officers can have no official knowledge of any city ordinance laying out streets unless provision is made for the authentication of such ordinances and their deposit among the records of the state. But passing this point, the legislature in the act of March 24, 1890 (Laws, p. 223, §5, subd. 37), providing for the government of cities of twenty thousand inhabitants, confirmed the right granted in the constitution, in its enumeration of the powers of such cities, in these words:

"Thirty-seventh: To project or extend its streets over and across any tide lands within its corporate limits, and along or across the harbor areas of such city, in such manner as will best promote the interests of commerce."

In *Columbia, etc., R. R. Co. v. Seattle*, 6 Wash. 332 (33 Pac. Rep. 824), we construed this statute, as it reads, to enlarge the authority expressed in the constitution, so as to authorize a city to extend its streets across any tide lands although the streets extended might never touch the harbor area. But now the position is taken that this statute covers the laying out of a street at the will of a city of the

first class, in any direction and to any extent, whether there was a street to begin with or not.  If that is the construction it must be found within the language of the statute, or by a plain implication therefrom.   The constitutional provision will clearly not admit of any such construction, for the words there used clearly imply that, the only purpose sought to be subserved was to enable the public to freely reach the harbor area, where, of necessity, commerce between the land and the water must meet.  The statute broadens the right to extend streets, and will be enforced as enacted.   But, in searching for the authority claimed by the respondent, we note—(1) That the power is to *extend* or *project* streets, and by those two words we understand the legislature to have meant the same thing.  They are common words, and when applied to an existing thing, like a street, they mean to construct it in the same direction, and with the same width.   (2) They are used with reference to existing things, since what a city may extend is *its* streets.   (3) The power is exhausted with the extension of existing streets.

Counsel pleads for a common sense construction of the statute, and suggests the absurdity of a case where the harbor area is a half mile or more from the shore, and only streets *to* it can be laid out, because the city is so situated that there can be no streets to extend crosswise.   We admit the absurdity that would occur if such a state of things were left to continue for any great length of time. But we submit that we have exhausted the sense of this statute, common and all, when we have read it according to its plain and unmistakable language; and we can only repeat what has been said before, that this matter is all in the hands of the legislature, which will, no doubt, remedy any absurdities which may result from the administration of this law as it was enacted.   We may, perhaps, be permitted to doubt, however, whether the legislature will ever,

advisedly, authorize the opening of such a street as this one seems to be, in a portion of its length, and the surrender of it bodily to three or four railroad companies in specific grants, to the practical exclusion of all other possible railroads from the city, except as they may pay tribute to those already in possession.

This street was laid out 120 feet wide, which is an unusual width, and perhaps a greater width than that of most of the city's streets; but if 120 feet, why not 200, or as great a width as the city may determine? And if any action of this kind which the city may take for the benefit of railroad companies is to be held binding upon the state, why not go further and claim that where the route of this street passes to the southward over tide flats a mile or more wide, it might be widened indefinitely so that broad ground would be furnished for side tracks? It is said in this record that the respondent has acquired 140 acres of these tide flats for its terminal purposes, by paying for them, but the principle which it invokes as against the state would have applied almost as well had the city extended another street over that whole area, and then given it a franchise to lay tracks across it. It is not the business of municipal corporations either to build railroads or to specially facilitate railroad companies. They have the power to regulate them, and nothing more. Gen. Stat., § 520, subd. 9.

Having disposed of the state's part of this case, we now turn to the other appellants.

3. The respondent is constructing a new railroad, which, together with other allied roads, will constitute the main line of the Great Northern railway system extending from St. Paul, Minn., and West Superior, Wis., to the city of Seattle. It will need, and has already arranged for, large terminal and repairing and building facilities at Seattle, a part of which are to the north of the city, and the remain-

der are to be at a distance of some five miles from the others, at the south.   Ground for a passenger station has been obtained in the neighborhood of Jackson and Third streets, and the place intended for the freight yards is the 140 acres above spoken of.   Its franchise over Railroad avenue consists of a permission to use sixty feet in width of that street throughout its length for one or more tracks. This width will accommodate four tracks, and it is prepared to place them all at once.   But when it reaches a point opposite the principal business portion of the city it comes upon ground which has, for many years, been wharfed over by the appellants, and used by them for railroad purposes, partly under ordinances of the city, one of which was under discussion in this court recently in the case of *Seattle v. Columbia, etc., R. R. Co.*, 6 Wash. 379 (33 Pac. Rep. 824), and partly without any public authority shown by the record.   A little to the northward of Washington street the four tracks of the respondent curving to the westward meet two of the appellants' tracks curving slightly to the east.   But for the fact that Railroad avenue, in the middle of which the respondent's tracks are, curves to the west at this point, there might be no necessity for any crossing or interference of the two sets of tracks, for by running its line some sixty feet to the west over private property and street crossings, respondent could lay its tracks substantially parallel to the others. Proceeding further southward, the position of the appellants' two tracks is such, curving as they do from nearly the center of Railroad avenue at Washington street, to nearly the extreme west side of the avenue at Main street, one block further south, and back across the avenue to its extreme east side at Jackson street, still another block south, that within a distance of some 700 feet the respondent's two easterly tracks will cross the appellants' said two tracks twice, and its two westerly tracks, for about 500

feet, will be upon and among said two tracks in such a manner, owing to appellants' curves, that no part of either track can be operated while any portion of another is in use. Add to this, that sixty feet south of Washington street the Columbia & Puget Sound Co., which uses the easterly of appellants' said two tracks, has a side track extending thence, parallel to its other track, to Jackson street and beyond; at Main street another side track commences within respondent's west track and curves to the north and west to a wharf where the Columbia & Puget Sound Co. has its passenger station; at Jackson street the Northern Pacific Co., beginning about the east line of Railroad avenue, runs out a spur crossing all of respondent's tracks going west to a wharf; and just north of Jackson street the Columbia & Puget Sound Co. turns off two side tracks near the east side of Railroad avenue, which tracks run to Washington street. The four main tracks of respondent do not touch the last mentioned side tracks, but at Main street it is proposed to run two tracks from its two easterly main tracks, by about an 8 per cent. curve, easterly across appellant Columbia & Puget Sound Co.'s two side tracks to its station grounds at Jackson and Third streets; and again, at King street, the Columbia & Puget Sound Co. has two elevated coal bunkers for delivering coal to ships, with several tracks on each. One of these bunkers is high enough to permit trains of cars passing under it, but the other is not, and, in order that room may be made, it is proposed to rearrange and rebuild this bunker. There is no practical possibility of respondent's passing these bunkers to the southward in any other way than that proposed, unless its entire road be carried to the east past its passenger station and thence across appellants' tracks beyond where the bunker tracks commence. By keeping its tracks to the west, from Washington street south to about Jackson, respondent can avoid all of the complicated cross-

ings; and by that method, if it pursues the plan of continuing its four tracks southward, they will cross only the spur of the Columbia & Puget Sound Co. to its wharf, the spur of the Northern Pacific Co. to its wharf, and the elevated tracks to the coal bunkers; all of which crossings will be nearly at right angles; and its passenger station tracks will need to cross but three of appellants' tracks once at Jackson street.   The proof shows such an arrangement would be practically as easy a line for respondent to build and operate as the one proposed by it.

It was the testimony of every witness upon the stand in the case that the plan proposed by respondent made a most undesirable series of crossings, which are to be avoided, from a railroad point of view, by all means if reasonably possible; and from the standpoint of the public, which has occasion to use the cross streets constantly, and which will furnish the patronage of all these railroad companies, the desirability of some other scheme is equally as great, for the constant dangers arising from the operation of a railroad traffic amounting to from two to four hundred train movements a day, according to the estimates of both parties, are too obvious for argument, occurring as they will in the heart of a busy city.   As proposed, in the space of seven hundred feet there are twenty-three crossings at such a sharpness of angle that trains could not move upon some of the tracks which lie substantially parallel to each other without collision; and such facilities as the Columbia and Puget Sound Co. has for the transaction of its local business in the city over the sidetracks mentioned to wagons, would be almost entirely destroyed.   Time and effort were expended in showing that this arrangement of tracks *could* be operated by means of inter-locking switches and watchmen.   Of course it could be done, and it does not take evidence to demonstrate it; but neither does it take evidence to show that it must be a most embarrassing

situation to all the parties to the case, as well as to the public. Respondent suggested that, in so far as appellants' principal tracks were concerned, they could save the most of these crossings by moving their tracks over to the east side of Railroad avenue, where the city has voted them thirty feet of the avenue for that purpose; but it is well understood that one railroad company is not thus required to turn out of its established way for another coming into the same neighborhood later. The last comer must accommodate itself to the first, unless another contention of respondent, to be noticed later, is sustained. Probably much, perhaps all, of this difficulty has arisen from the attempted establishment of Railroad avenue and the assumption of the respondent that it could not travel outside of its limits; if so, an ordinance from the city is all that lies in the way of correcting the error.

Other matter in the case related to the comparative length of the respective railroads, and the traffic upon them past and prospective. Particular obloquy was sought to be cast upon the Columbia & Puget Sound road, because it is but a short line leading into some coal districts. But the statutes, and the administration of them by courts, do not make the right of eminent domain depend upon the length of a railroad or the amount of its business, and neither do the rights of a railroad company to keep what it is in good faith employing in such business as it has depend upon the like considerations. Those matters relate entirely to the damages to be allowed when it is proposed to cross their rights-of-way and tracks, a subject which this opinion will not discuss. The evidence clearly showed that neither of the appellants had such facilities in Seattle as they ought to have. These were somewhat awkwardly situated for the present and future operation of the roads; but they were put there when they had to serve a much smaller community, and the owners now have to operate

them as best they may.    All of this, however, does not detract from the right of these companies, as against the respondent, to have them remain as they are, undisturbed, except as its necessities, as an equal servant of the public, may require them to be trenched upon.

4. All this is certainly true, unless a point now to be noticed is sustained.

Sec. 1571, Gen. Stat., reads as follows:

"Every corporation formed under this chapter for the construction of a railroad shall have the power to cross, intersect, join and unite its railway with any other railway before constructed *at any point* in its route, and upon the grounds of such other railway company, with the necessary turnouts, sidings, switches and other conveniences in furtherance of the objects of its connections, and every corporation whose railway is or shall be hereafter intersected by any new railway shall unite with the corporation owning such new railway in forming such intersections and connections, and grant the facilities aforesaid; and if the two corporations cannot agree upon the amount of compensation to be made therefor, or the points and manner of such crossings and connections, the same shall be ascertained and determined in the manner provided by law for the taking of lands and other property which shall be necessary for the construction of its road."

Without any direct provision on the subject, one railroad must have the right to cross another, since the authority to build railroads from one part of the country to another could not be exercised without it, and the foregoing section merely regulates the manner of acquiring that right, with some others.    Appellants contend, however, that the plan proposed by respondent is not entitled to be treated as a crossing, but as a longitudinal taking of their property devoted to public uses, and therefore not authorized either by the statute or by decisions of courts.    It is a general rule that property which is already devoted to one public use, such as streets, parks, burying grounds, state,

county and other public institutions, and railroad rights-of-way, station grounds, terminal grounds, yards and the like, cannot be taken for another public use under the eminent domain laws, unless there is express or clearly implied statutory authority therefor. Gen. Stat., §§ 1574–5, provides for cases where public grounds under the jurisdiction of counties and cities are necessary for railroad purposes, but there is nothing further in our statutes on that subject, except that Code Proc., § 658, makes provision for the cases where it is necessary for a railroad to go through a cañon, pass or defile already occupied by an earlier road.

The leading cases on this point are *Matter of Boston & Albany R. R. Co.*, 53 N. Y. 575, concerning the taking of a public park; and *Matter of City of Buffalo*, 68 N. Y. 167, where lands used for railroad yards, tracks and switches were sought to be taken for the building of a canal. Others are: *Baltimore, etc., R. R. Co. v. North*, 103 Ind. 486 (3 N. E. Rep. 144); *In re Providence, etc., R. R. Co.*, 17 R. I. 324 (21 Atl. Rep. 965); *St. Paul Union Depot Co. v. St. Paul*, 30 Minn. 359 (15 N. W. Rep. 684); *Barre R. R. Co. v. Montpelier, etc., R. R. Co.*, 61 Vt. 1 (17 Atl. Rep. 923); *Appeal of Sharon Ry. Co.*, 122 Pa. St. 533 (17 Atl. Rep. 234).

Appellants, as an inducement to the holding that the respondent's plan amounts to a longitudinal taking, ask a finding that the tracks to be crossed constitute a part of their yard, but we do not think they make out a case for the application of the rule as to yards. Certainly the Northern Pacific Co. does not, for it has only one track, and one switch leading to its wharf, within the disputed ground, and as to both appellants, if the ordinance No. 262 sustained in *Columbia, etc., R. R. Co. v. Seattle, supra*, is to have any force in limiting its authority to lay tracks along the water front, they exhausted their right to lay tracks

when they constructed a double track along the thirty foot
right-of-way designated by the ordinance, for there was no
mention of side tracks in the ordinance, except switches to
wharves.    As to the bunker tracks in King street, we
think it safe to say that no railroad company should be
permitted to claim that tracks, no matter how numerous,
when constructed lengthwise upon a public street, consti-
tute a part of its yard so that they may not be crossed by
a new railroad where there is a reasonable necessity there-
for.    In such case all that the railroad has is a permanent
license, not coupled with any interest in, or ownership of,
the land, or any contingency through which it may acquire
the land.

But, notwithstanding we cannot find these to be yards
of the appellants, it appears obvious, from the maps on file
in the case, that as to the two westerly tracks of respond-
ent there is much more than a crossing, or even a double
crossing, for these two tracks lie lengthwise of the appel-
lants' thirty-foot right-of-way, or so nearly so that for a
distance of more than four hundred feet it will be imprac-
ticable to operate either track or set of tracks when any
one of the other tracks is in actual use, for want of passing
room.    We do not think that the creation of such a situa-
tion is what the law means when it gives one railroad the
right to cross another, nor did any of the witnesses, some
of whom were persons of large experience as engineers and
practical railroad operators, speak of any such case exist-
ing.    One instance of a double crossing caused by the
straight track of one road intersecting the curved track of
another at Dayton, Ohio, was shown to have existed for
some years ending fifteen years ago, but whether that case
was brought about by condemnation proceedings or not,
did not appear.    It was testified that there were some
worse crossings than this proposed, all things considered,
and the respondent, as an example, put in evidence a num-

ber of the Chicago *Engineering News*, containing a cut of
a certain set of crossings in that city, at Stewart avenue
and Twenty-first street.   The crossings illustrated look
complicated enough, certainly, but although five different
railroads cross each other's tracks at that point, none of
them having less than two, and one of them having four,
tracks, there is not one double crossing, and there is no in-
stance of a track or set of tracks overlaying and running par-
allel to and upon the tracks of another road.   Moreover the
article to which the illustration belongs is devoted to a
lamentation over the state of things in Chicago growing out
of the numerous and complicated grade crossings of rail-
roads (of which the Stewart avenue crossings is a fair sam-
ple), and to a consideration of the best method of doing
away with what has become such a nuisance that the city of
Chicago, as the article shows, has ordered the elevation of
all such tracks, at immense cost, or their removal from an
area half a mile wide by two or three miles long.   The
argument to be drawn from this example is not favorable
to this proposition considered as a crossing.

Concerning a proposed crossing very much less compli-
cated than this, it was said in *Missouri, etc., Ry. Co. v.
Texas, etc., Ry. Co.*, 10 Fed. Rep. 479:

"The most common experience has little need of the
testimony of experts to aid it in reaching the conclusion
that such crossings as this application seeks to have re-
strained would be such a source of danger of collision in
the transit of trains as could not be adequately compen-
sated by any moneyed consideration, and such as should
not be permitted except under the pressure of some para-
mount necessity for the service of the public convenience
or of the state."

5. But passing this matter, the final position of the re-
spondent is that, no matter what may be the character of
the crossing, or how destructive of the property of the ex-
isting road, "it is for the corporation building the new line

to select its route, as all the considerations bearing upon that selection dictate to *it*, and that if such route requires a crossing and recrossing of an existing line, the new corporation has as much right, under the statute, to make such crossing and recrossing as it would have to make a single crossing," though it admits that an attempted crossing in bad faith, merely for the purpose of vexing the senior road, should not be permitted. This is to say that, so long as the junior road is not convicted of bad faith in its proposition, the courts have no right to inquire into the necessity of the place and manner of crossing, but must simply proceed with an assessment of damages, and this requires a study of our statutes on the subject.

Certainly all of the provisions of Gen. Stat., chap. 5, title 18, conferring these powers on railroad corporations, are to be exercised in the manner provided for in Code Proc., chap. 6, title 9, known as the eminent domain act. Sec. 1571 of the former volume, concerning crossings, expressly makes the latter law applicable where the companies cannot agree. Now it is a provision of Code Proc., § 651, that if at the time and place appointed for the hearing of the petition the court or judge shall be satisfied by *competent proof* "that the land, real estate, premises or other property so sought to be appropriated are required and necessary for the purposes of such enterprise," he shall make an order for a jury. The mere statement of the petitioner is not, under this law, to be taken as final, but the court must be *satisfied* by "competent proof," and upon that and that alone he is authorized to act further. Nothing is said about cases where there may be a failure of such proof, but the plain implication follows that if the proof is not made the proceeding must fail. And this proof must satisfy the court that the condemnation as proposed is "required and necessary," a mere showing of convenience or lessening of expense not being sufficient. Lewis,

Em. Dom., § 393; *Matter of New York Central R. R. Co.*, 66 N. Y. 407; *Appeal of Sharon Ry. Co.*, 122 Pa. St. 533 (17 Atl. Rep. 234); *In re St. Paul, etc., R. R. Co.*, 37 Minn. 164 (33 N. W. Rep. 701).

The same rule applies to a crossing, and according to the record the respondent must have been proceeding in the court below in exact accordance with it; for it voluntarily began the case by offering proof to sustain the claim that the crossing proposed was necessary, and some hundreds of pages of testimony are devoted to nothing else. But respondent's claim goes further, and asserts that if there exists a necessity for it to proceed in the way it has laid out, the court is not to consider the convenience of the railroad to be crossed or the practicability of some other means of accomplishing the same purpose, Plainly, however, if the junior road proposes to cross at a place or in a manner which will be disproportionately injurious to the senior road, and there be near by some other place where the junior road can pass and go on its way without any crossing at all, it must follow that there is no necessity for the crossing; or if there be some other point or means of crossing imposing less cost and difficulty of operation to the senior road; and merely additional expense to the junior, the like want of necessity is evident.

Respondent does not suggest what disposition is to be made of that portion of Gen. Stat., § 1571, which provides that "if two corporations cannot agree upon . . . the *points* and *manner* of such crossings . . . the same shall be ascertained and determined in the manner provided by law for the taking of lands." But it is very important, and, it seems to us, is decisive of this whole matter; and it is especially pertinent here, because there must be some crossing of appellants' tracks to enable respondent to prosecute its enterprise. The matter of the points and manner of crossing—the place where, and

whether under, over or at grade — is to be decided upon
the application to the court, and by the court, since it is
an exercise of its equitable powers. *Chicago, etc., R. R.
Co. v. Chicago & Pacific R. R. Co.*, 6 Biss. 219; *Hunnes-
ton, etc., Ry. Co. v. Chicago, etc., Ry. Co.*, 74 Iowa, 554
(38 N. W. Rep. 413).

*Lake Shore, etc., Ry. Co. v. Chicago, etc., R. R. Co.*, 97
Ill. 506, is cited in support of the contrary view, to the
effect that the junior road can determine the point of cross-
ing for itself, so long as it is willing to pay for the damage
it does, which was assessed in *Same v. Same*, 100 Ill. 21.
In the former case the court was construing a statute in
the exact words of our Gen. Stat., § 1571, with this im-
portant difference, that whereas our statute provides that
where there is no agreement between two corporations as
to the points and manner of crossing "the same shall be
ascertained and determined in the manner provided by law
*for the taking of lands*," etc., the Illinois statute merely
provided that "the same shall be ascertained and deter-
mined in *manner prescribed by law.*" Stat. of Ill., 1885,
p. 1914.   Moreover, the eminent domain act there under
discussion did not contain any provision requiring the court
to be satisfied of the necessity of the proposed taking. *Id.*,
p. 1041, *et seq.*   Counsel in the case were contending that,
although the authority to cross was expressly conferred by
the statute, it was inoperative because it was a taking of
property which could not be taken without compensation,
and no law had been enacted for the ascertainment of such
compensation or the determination of the points and man-
ner of crossing.   This necessitated the court to say that,
if the contention set up were sustained, it must result that,
in Illinois, no railroad could cross another at any point,
and it held that the eminent domain act was adapted and
intended to ascertain damages for railroad crossings as well
as other condemnations of land; but it confessed that the

law had not provided the method of ascertaining the points and manner of crossing, and therefore fell back upon the language of the act which gave to every railroad company the right to cross any other railroad "at any point on its route," and interpreted it to mean that the petitioner could fix its own point of crossing, referring at the same time to a former law which authorized commissioners to fix points and manner of crossing. The difference between the two statutes is so obvious that comment is unnecessary. *Lake Shore, etc., Ry. Co. v. Cincinnati, etc., Ry. Co.*, 116 Ind. 578 (19 N. E. Rep. 440), was a discussion of a statute exactly like our Gen. Stat., § 1571, except that in case of disagreement the points and manner of crossing were to be fixed in the first place by commissioners, as was the amount of compensation. On a question as to the sufficiency of allegations showing an inability to agree, one side arguing that the necessity for showing disagreement only went to compensation, the court said:

"We cannot see how it is possible, looking solely to the words of the statute, to hold that all that it refers to is the matter of compensation, since to reach such a conclusion many strong and clear words must be rejected. The language is plain, but plain as it is, we think it not more plain than the object the legislature intended to accomplish. It is very evident that the legislature did not mean to invest the younger company with power to cross at any point and in any mode it might elect; but that, on the contrary, it meant to prevent the arbitrary exercise of the right to cross the older line.  .  .  .  Our conclusion is that the negotiations which the statute requires the two corporations to conduct, are negotiations concerning the three things we have enumerated—compensation, and points and manner of crossing—and that if these three things cannot be settled by negotiation they must be brought before the appropriate tribunal for adjudication."

Cases upon statutes similar to ours and that of Indiana are found in *St. Louis T. Ry. Co. v. St. Louis, I. M. & S.*

*Ry. Co.*, 100 Mo. 419 (13 S. W. Rep. 710); *Montana, etc., Ry. Co. v. Helena, etc., R. Co.*, 6 Mont. 416 (12 Pac. Rep. 916); *Toledo, etc., R. Co. v. East Saginaw, etc., R. Co.*, 72 Mich. 206 (40 N. W. Rep. 436); *Union Pacific Ry. Co. v. Leavenworth, etc., Ry. Co.*, 29 Fed. Rep. 728; *In re Lockport, etc., R. Co.*, 77 N. Y. 557; *In re Minneapolis, etc., Ry. Co.*, 36 Minn. 481 (32 N. W. Rep. 556), and *In re St. Paul & N. P. Ry. Co.*, 37 Minn. 164 (33 N. W. Rep. 701), in all of which the matter of the points and manner of crossing are treated as, or held to be, matters of judicial determination, and not of arbitrary exercise by the petitioning corporation.   In the case cited above from 6 Biss., the United States circuit court of the northern district of Illinois held that, although the general policy of the legislation of that state was to allow a new railroad to cross an existing road at grade, equity would interfere to compel it to cross overhead, at a different place, although at some cost, where the crossing proposed would materially interfere with the business of the senior road.   Judging this case by our own statute, and by these authorities, we do not think the respondent made out a case of necessity that it should cross appellants' tracks at the point and in the manner proposed, except as to the crossing beneath the coal bunkers of the Columbia & Puget Sound Company.

One of the items in which it failed has not yet been mentioned, viz., its proposed crossing with four tracks.   It showed no definite intentions as to the use of so many tracks, but suggested that it would probably use the easterly two tracks for the passage of its freight and passenger trains, the third track for the passing and repassing of locomotives, and the fourth track for connections with wharf spurs.   All of these tracks it calls "main tracks," but they are obviously so in name only.   The main line consists of but a single track, and the three additional tracks are for mere connections between the shops and the freight

yard.    Conceding, however, that a necessity was shown
for two tracks for the purposes of such connection through
the city, it was not suggested why these two tracks could
not perform the entire service required or likely to be re-
quired.    Ordinarily, under the statute, a railroad company
is permitted to condemn land to a certain width, and may
maintain thereon as many tracks as it sees fit, but in such
a case as this, which the principal of respondent's witnesses
likens to the case of a cañon or defile, the right-of-way al-
lowed to be taken should be limited to what is necessary,
and no more.    With two tracks — an inward and an out-
ward — it would have facilities far better than those of
either of the appellants, and equal to those of nine rail-
roads in ten in the country.    Being located practically upon
the streets of a city, where the whole room applicable to
railroad purposes is shown to be extremely limited, it should
not expect more, and certainly the public interest would
not be subserved by conceding more for the purposes set
forth.

6.    Appellants claim that there was no attempt on the
part of respondent to agree with them as to the points and
manner of crossing, and the record sustains them.    In cases
of crossings like this one, courts will not be technical in
requiring an effort to agree, but the theory adopted by re-
spondent, and its letter to the appellants, shows that it
purposely limited its proposition to one of compensation
for the specific crossing described, and none other.    The
importance of showing an attempt to agree upon the three
cardinal points appears from the cases we have cited else-
where.

7.    We do not think there was error on the part of the
judge who heard the case on the question of necessity in
sending the jury trial to another judge, for the case con-
sisted of two distinct branches.    If a judge should die or
retire from the bench after ordering a jury, there could

certainly be no necessity for going over the preliminary part of the case again; but on 'a motion for a new trial before the second judge, we think the whole case would be open for reëxamination, and the better practice would be for the same judge to hear the entire matter.

8. The proposition of the respondent to stipulate that it would put in and maintain at its own expense all necessary frogs and crossing apparatus was proper, and is sustained by authority. *Chicago, etc., R. R. Co. v. Joliet, etc., Ry. Co.*, 105 Ill. 388. So, also, we think, would be the proposition to construct and maintain the overhead arrangement for the crossing under the bunkers, the manner of construction being left to the court in case the parties could not agree.

Other questions in the case appealed have either been covered or are immaterial to a decision. The decree of appropriation will be reversed, and the petition dismissed.

DUNBAR, C. J., and ANDERS and SCOTT, JJ., concur.

HOYT, J., dissents.