[No. 33706. *En Banc.* February 7, 1957.]

THE CITY OF TACOMA, *Appellant*, v. THE TAXPAYERS OF TACOMA *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 307 P. (2d) 567.

E. K. *Murray*, Marshall *McCormick*, and *Frank L. Bannon* (*Robert R. Hamilton* and *James F. Henriot*, of counsel), for appellant.

*Lynch & Lynch*, for respondents and cross-appellants taxpayers.

*The Attorney General, Joseph T. Mijich* and *E. P. Donnelly, Assistants*, for respondents and cross-appellants Schoettler *et al.*

A. C. *Van Soelen*, Glen E. *Wilson*, and *Frank P. Hayes*, *amici curiae.*

WEAVER, J.—This action was instituted by the city of Tacoma against the taxpayers of Tacoma and the directors of game and fisheries of the state of Washington, pursuant to the declaratory judgment act (RCW 7.24.010, *et seq.*) and RCW 7.24.150, *et seq.*, to test and determine plaintiff's right to issue and sell certain utility revenue bonds to finance the construction of two power dams on the Cowlitz river in Lewis county.

The action was commenced in Pierce county; later, by stipulation and order of court, it was transferred to Thurston county.

The case was here on a prior appeal. *Tacoma v. Taxpayers*, 43 Wn. (2d) 468, 262 P. (2d) 214 (1953). This court reversed the judgment of dismissal entered by the trial court after sustaining defendant taxpayers' demurrer to the original complaint. (We refer to that decision for an understanding of the material facts involved on the first appeal.)

The case was remanded to the superior court for further proceedings in accordance with the views therein expressed.

Preliminary to a discussion of the merits of this case, we point out that the city of Tacoma was granted a license by the Federal power commission, after hearings held in 1951, to construct the two dams on the Cowlitz river. The state of Washington, represented by the attorney general; the directors of game and fisheries, cross-appellants; and Washington State Sportsmen's Council, Inc. (not a party to the present case), were given notice of the hearings and appeared before the Federal power commission and actively participated in that proceeding. The parties petitioned the court of appeals for the ninth circuit to review the decision of the Federal power commission (*In the Matter of the City of Tacoma, Washington, Project No. 2016*); the commission's decision was affirmed. *State of Washington Department of Game v. Federal Power Comm.*, 207 F. (2d) 391 (C. A. 9th; 1953), cert. den. 347 U. S. 936, 98 L. Ed. 1087, 74 S. Ct. 626 (1954).

The proceedings in the superior court, between October 14, 1953, the date the remittitur of this court was filed, and March 6, 1956, the date of the final judgment from which the present appeal and cross-appeal are taken, are set forth in the lengthy transcript on appeal. It would unduly extend this opinion to give a resume of the various pleadings, motions, and orders.

After our former opinion, the trial court entered an order overruling taxpayers' demurrer to the complaint. The taxpayers of Tacoma filed an answer and cross-complaint, denying that the Federal license had any legal force or effect, and affirmatively alleged that the city had exceeded its au-

thority under the state statutes. The city's demurrer was sustained to the cross-complaint.

April 29, 1954, the directors of game and fisheries filed a second amended answer and cross-complaint that, in substance, was similar to prior pleading, except they alleged, for the first time, that the Cowlitz river is nonnavigable at the dam sites.

April 29, 1954, the city of Tacoma filed a petition praying that attorneys' fees as costs be fixed and determined, and that the city's liability for further legal services be terminated in accordance with the provisions of the declaratory judgment act. The petition stated that nothing further remained to be done by the taxpayers of Tacoma, except to establish the allegations of the complaint (if denied) and enter judgment. The prayer requested that the taxpayers be denied costs for attorneys' fees in connection with their cross-complaint.

On the same date, the taxpayers of Tacoma answered. They said they had done all that was expected of them; that they had filed an answer and cross-complaint, because it was the only further step they could take; and that they should be allowed costs and attorneys' fees.

April 29, 1954, the superior court entered an order absolving the taxpayers from any further defense or prosecution of the action. Subsequently, the superior court fixed the amount of attorneys' fees to be paid by the city to the taxpayers.

June 24, 1955, the directors of game and fisheries filed a motion for a temporary restraining order and injunction, *pendente lite*, to enjoin further development and construction of the Cowlitz project and the sale of the proposed bond issue. The affidavit of an assistant attorney general, filed in support of this motion, alleges that a large portion of certain state highways would be inundated and must, of necessity, be condemned; and that

"Ordinance No. 14386 authorizes the condemnation of the state game hatchery, known as the Mossyrock Hatchery, located on the Cowlitz River. This hatchery is located on Government Lots 4, 7, 8, and 9, Section 11, Township 12

North, Range 2 East Willamette Meridian, in Lewis County, Washington. The state also has a water right there. The reservoir created by the Mayfield Dam will inundate and overflow the entire hatchery. This hatchery site has been segregated from the public domain and already appropriated to a public use.

"The City of Tacoma, being a limited arm of the state government, cannot condemn property such as this already dedicated to a public use. *State v. Superior Court,* 91 Wash. 454, 157 Pac. 1097 (1916). Therefore, the ordinance authorizing such condemnation is invalid and the City is proceeding contrary to the laws of the State of Washington. Affiant alleges that no agreement between the City of Tacoma and State authorities has been reached, and that legislative action will be necessary before Tacoma can build the project. There has been no such legislative action as yet.

"On June 21, 1955, the City of Tacoma awarded bids for the purchase of Tacoma city Light revenue bonds, totalling $15,000,000, to pay for the construction of part of the Mayfield Dam. Affiant is informed and believes that the City will deliver said bonds to the purchasers in the immediate future; on June 22, 1955, the City of Tacoma awarded the contracts for the construction of the Mayfield Dam, and the City intends to authorize the commencement of said construction in the immediate future.

"Affiant is informed and believes that if the threatened acts of the plaintiff in delivering the bonds and commencing construction of the Mayfield Dam are not enjoined pending the outcome of this action, irreparable injury will result to the State of Washington in that part or all of the fish runs in the Cowlitz River will be destroyed for which adequate damages cannot be ascertained. Also, if invalid bonds are permitted to be on the market, the public will suffer and it is the responsibility of the State of Washington to prevent this."

On the filing of this motion and affidavit, the superior court, *ex parte,* issued a temporary restraining order and order to show cause. It enjoined the city from directly or indirectly developing, constructing, or contracting for the construction of the two dams; from delivering or permitting the sale of any bonds for the payment of costs of the Cowlitz project; and ordering the respective parties to appear at a hearing on the matter on August 8, 1955.

June 28, 1955, the city of Tacoma, appellant, filed a motion to quash and dissolve the temporary restraining order. It was supported by affidavits that stated in substance: (a) that the action had been pending for more than two years; (b) that during this time the directors of game and fisheries had known that the city contemplated calling for bids on contracts and the sale of bonds; (c) that for the past year this action had awaited the ruling of the superior court upon the city's demurrer to the directors' second amended cross-complaint; (d) that the protection of fish in the Cowlitz river was a matter for presentation before the Federal power commission; (e) that all matters proper for determination herein had been decided by the supreme court of this state upon the first appeal. (*Tacoma v. Taxpayers, supra*); (f) that the judgment in the case entitled *State of Washington Department of Game v. Federal Power Comm., supra*, was *res judicata* as to all other matters pleaded by the directors of game and fisheries in their second amended answer and cross-complaint; (g) and, that the continuation of the temporary restraining order would result in irreparable damage to the city of Tacoma. A hearing on the motion to quash was set for June 30, 1955. July 7, 1955, the court modified the temporary restraining order to read:

". . . Plaintiff (appellant) and its officers and agents be and they are hereby restrained and enjoined from doing any act or thing in any manner interfering with the bed or waters of the Cowlitz River in connection with its Mayfield and Mossyrock Dam Projects, or in any way injurious to the fish runs or fish resources of said river, . . ."

July 27, 1955, the city filed an amended complaint. July 29, 1955, the directors of game and fisheries moved to *substitute* the sovereign state of Washington as a defendant in this action. The affidavit, in support of this motion, alleged:

"The proposed project will affect lands, structures, waters, and fish, the ownership and jurisdiction over which is in the State of Washington *and not in the above-named defendants* (directors of game and fisheries); and, therefore, the real party in interest, of this action, which will be affected by the decision of this Court is the State of Washington."

Over objection of the city, August 8, 1955, the court entered an order granting permission "to add the State of Washington as a party defendant herein . . ."

August 29, 1955, the directors of game and fisheries and the state of Washington filed an answer and cross-complaint to the city's amended complaint. They alleged: (a) that the Cowlitz project would interfere with *public navigation* on the Cowlitz river, which the city is prohibited from doing under the provisions of RCW 80.40.010; (b) that appellant had not obtained an extension of time beyond December 31, 1955, to commence construction; (c) *that the proposed Cowlitz project would damage and destroy state lands dedicated to a public use that the city of Tacoma, as a municipal corporation, is unable to acquire*; (d) that the city had not complied with the provisions of RCW 90.28.010 (permission to inundate state highways), and RCW 90.20.010, *et seq.* (water appropriation permit); (e) and, that the city had attempted to circumvent state laws by commencing an action in Federal district court at Tacoma. (The city states in its brief that it voluntarily dismissed this action.)

September 27, 1955, the directors of game and fisheries and the state of Washington filed a joint amended answer and cross-complaint. It contained, substantially, the same matters as the directors' prior pleading, except that the various parcels of state land devoted to public uses were described by legal description. There was an added allegation and exhibit which, in substance, indicated that the state game commission had passed a resolution August 16, 1955, instructing the director of game to take every legal procedure to resist any effort of the city to condemn or in any manner acquire the Mossyrock fish hatchery, because it was irreplaceable.

October 7, 1955, the trial court entered a restraining order *pendente lite*. It modified the temporary restraining order of July 7, 1955, by inclusion of the following proviso:

". . . PROVIDED HOWEVER, that the plaintiff, its agents, employees and officers, be and they are hereby authorized to construct the coffer dam for the powerhouse site and to do

blasting necessary to construction, Provided that no blasting shall take place in the waters of the Cowlitz River."

October 11, 1955, the trial court entered an order, over objection of the city, appointing new attorneys to represent "all taxpayers of the City of Tacoma." The taxpayers, theretofore appointed, had withdrawn from the proceeding and had defaulted within the provisions of the declaratory judgment act.

November 30, 1955, the newly appointed attorneys, upon behalf of all taxpayers, filed an answer and affirmative defense to the city's amended complaint. It contained virtually the same allegations as the amended answer and cross-complaint of the directors and the state of Washington.

January 3, 1956, the parties filed a pretrial conference stipulation and order. It stated: (a) that the city had entered into contracts for the construction of the Mayfield dam, and that construction had been commenced; (b) that two ordinances, amendatory of ordinance No. 14386, had been passed; (c) that a license to build the dams had been issued appellant by the Federal power commission; (d) *that completion of the dams and closing of the gates would inundate a large portion of a fish hatchery, owned and operated by the state, as well as other state land, as described in the pleadings*; (e) that the directors of fisheries and game, if permitted, would show probability of injury to fish; (f) that the city had not yet obtained permission to inundate state highways, under the provisions of RCW 90.28.010, but that plans had been submitted for review to the director of highways; (g) that the city had used and would continue to use surplus funds of its light utility to pay costs of the Cowlitz project, and would issue and sell revenue bonds of its light utility therefor.

January 5, 1956, the trial judge wrote a letter to counsel. We quote, in part:

"After reading briefs the Court feels that testimony can be limited to the question of navigation. . . .

"Upon the question of damage to fish the Court is of the opinion that the decision of the Federal Power Commission

and the decision of the Supreme Court of this state are controlling.

*"Upon the question of relocation of the fish hatchery, the Court is of the opinion that only a question of law is presented. The question of law will relate to the extent of the powers of condemnation given to plaintiff under the license from the Federal Power Commission."*

. The case was tried January 11, 1956, upon the city's *amended* complaint, the taxpayers' answer and affirmative defense, and the directors' and state's amended answer and cross-complaint, as limited by the stipulation and the above-quoted letter. Findings of fact and conclusions of law were made; judgment was entered March 6, 1956. The trial court declared the status of the parties to be as follows:

"It Is Hereby Ordered, Adjudged And Decreed that the question of the capacity of the plaintiff to acquire property of the defendant, State of Washington, by eminent domain is not within the jurisdicton of this court,

"It Is Further Ordered, Adjudged And Decreed that the question of damage to fish which might result from construction of plaintiff's Cowlitz Project was passed upon by the Federal Power Commission and the Federal Courts and is not now a proper one for consideration by this Court.

"It Is Further Ordered, Adjudged And Decreed that Sections 27 and 36, Chapter 117, Laws of 1917, as amended (R. C. W. 90.20.010 and 90.28.060) are inapplicable to said project insofar as the same conflict with the provisions of the Federal Power Act or the terms and conditions of plaintiff's License for said project, or insofar as they would enable State officials to exercise a veto over said project.

"It Is Further Ordered, Adjudged And Decreed that the provisions of Chapter 9, Laws of 1949, (R. C. W. 75.20.010 et seq.), and Sections 46, and 49, Chapter 112, Laws of 1949, as amended (R. C. W. 72.20.050 and 75.20.100), are inapplicable to said project insofar as the same conflict with the provisions of the Federal Power Act or the terms and conditions of plaintiff's License for said project, or insofar as they would enable State Officials to exercise a veto over said project. .

"It Is Further Ordered, Adjudged And Decreed that the plaintiff is acting illegally and in excess of its authority in the construction of the Mayfield and Mossyrock hydroelectric project as presently proposed for the reason that

said project *would necessarily impede, obstruct or interfere with public navigation contrary to the proviso of R. C. W.* 80.40.010 *et seq.*

"It Is Further Ordered, Adjudged And Decreed that the injunction pendente lite, entered October 7, 1955, be continued in effect until July 1, 1956, from and after which later date plaintiff is hereby enjoined from spending any sums of money relating to the Mayfield and Mossyrock hydroelectric project." (Italics ours.)

June 28, 1956, the chief justice continued the injunction *pendente lite.*

The city of Tacoma (appellant) has made fifteen assignments of error. The taxpayers of Tacoma, the directors of game and fisheries, and "The State of Washington, a Sovereign State" (respondents and cross-appellants) have made two assignments of error on their cross appeal.

Although this action has evolved into a Hydra-headed controversy, a single question at its nucleus is determinative of its disposition.

Does a municipal corporation, created by the state as a subordinate unit, have the power to condemn state lands held in a governmental capacity and previously dedicated to a public use; and if not, can a municipal corporation be endowed by Federal legislation with power to condemn such lands belonging to the state?

This question is neither abstract nor academic. The state-owned Mossyrock fish hatchery and the land necessary for its operation, which are of substantial value, will be inundated by the proposed dam. In the sense that the question requires a definition of the powers of the sovereign state and one of its created agencies, the problem is a local one peculiarly within the province of the courts of this state; hence, assuming, *arguendo*, that the question was before the court of appeals for the ninth circuit in *State of Washington Department of Game v. Federal Power Comm., supra* (an erroneous assumption, as we point out later in this opinion), it is not *res judicata* against the state of Washington.

This precise question is presented to us by cross-appellants' (the taxpayers, the directors, and the state) first assignment of error, which reads as follows:

. "The court erred in making and entering its conclusion of law No. III and in entering its judgment, dated March 6, 1956, insofar as it included therein paragraph I reading:
" 'IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the question of the capacity of the plaintiff to acquire property of the defendant, State of Washington, by eminent domain *is not within the jurisdiction of this court.*' " (Italics ours.)

The city (appellant and cross-respondent) argues that this question is not before us. Two reasons are given: first, that the taxpayers of Tacoma (respondents and cross-appellants) are precluded by the law of the case as declared on the first appeal to this court; and second, that Robert Schoettler, as director of fisheries, and John A. Biggs, as director of game of the state of Washington, and "The State of Washington, a Sovereign State" (respondents and cross-appellants) are bound by the doctrine of *res judicata.*

In support of these reasons, our former opinion in this case (*Tacoma v. Taxpayers, supra*) and the opinion of the United States court of appeals in *State of Washington Department of Game v. Federal Power Comm., supra,* are cited, analyzed, and discussed.

If the state of Washington, in its sovereign capacity, is not bound by the theory advanced by the city, we reach the question of the city's power to condemn state lands previously dedicated to a public use. The position of the remaining parties, and the other assignments of error, would not require examination.

We are inclined to the view that the theory advanced by the city does not apply to the taxpayers of Tacoma nor to the directors of game and fisheries. This is based upon the following: (a) in our former decision, the sole question before this court was whether the city's *first* complaint stated a cause of action; (b) neither our former opinion nor the opinion of the Federal court of appeals discussed the question of the city's power and capacity to condemn state-owned property previously dedicated to a public use—in fact, the latter opinion excludes the question; (c) the question did not appear until pleaded *after* we had remanded the case to the trial court; (d) the case is now before us

after *trial* of issues formed by the city's *amended* complaint, filed July 27, 1955, and the answers, affirmative defenses, and cross-complaints thereto.

Since we base our conclusion that the trial court should be affirmed upon other grounds, we do not deem it necessary to expand our reasons for concluding that the taxpayers of Tacoma and the directors of game and fisheries are not precluded by the law of the case and the doctrine of *res judicata.*

The state of Washington, in its sovereign capacity, is not bound by the doctrine of *res judicata* (assuming, *arguendo,* that the issue involved has been before a court of competent jurisdiction), for the manifest reason that *the state was not a party to this action* at the time our former decision was rendered.

The state of Washington became a party defendant by order of court, entered August 8, 1955. The order was entered on motion of the directors of fisheries and game, supported by an affidavit, the allegations of which we quoted *supra.*

An attempt is made to avoid the conclusion that the state did not become a party to this action until August 8, 1955, upon the authority of *State v. Pacific Tel. & Tel. Co.,* 9 Wn. (2d) 11, 113 P. (2d) 542 (1941). We do not find the case apposite.

■ We have not overlooked the fact that the state-owned land involved is not in Pierce county, where this action was commenced, nor in Thurston county, to which this action was transferred by stipulation and order of court; but this is *not* a condemnation action. It involves a determination of the *power to condemn,* not the actual condemnation. In *Donaldson v. Greenwood,* 40 Wn. (2d) 238, 250, 242 P. (2d) 1038 (1952), we quoted with approval:

" 'A state can exercise through its courts jurisdiction to order or to forbid the doing of an act within the state, although to carry out the decree may involve doing an act or affecting a thing in another state.' Restatement, Conflict of Laws, 147, § 97."

*A fortiori,* since the parties and the issue were before the superior court of Thurston county, it had jurisdiction to resolve the question of the power of the city to condemn state-owned lands. In this respect, the trial court erred in the first paragraph of its decree, quoted *supra,* in which it said that

" . . . the question of the capacity of the plaintiff to acquire property of the defendant, State of Washington, by eminent domain is not within the jurisdiction of this court."

In *Pacific Tel. & Tel. Co. v. Henneford,* 195 Wash. 553, 81 P. (2d) 786 (1938), the plaintiff company secured an injunction against the state tax commissioner, enjoining him from collecting a certain use tax. Three years later, the state commenced an action against the company to recover the same tax. In *State v. Pacific Tel. & Tel. Co., supra,* this court held that the first action was *res judicata* of the second, saying:

"This court has held that, where an action is brought by or against the officers of a state which affects the right of the state *to collect its revenue,* it is, in effect, an action by or against the state. [Citing cases.]" (Italics ours.)

Thus, the court limited its decision to the particular facts before it; namely, the collection of revenue. Finally, the court announced the guide to be followed when it said:

"The general rule is that a judgment for or against the state or an officer or agency thereof *in matters as to which such officer or agency is entitled to represent the state in litigation,* is conclusive for or against the state. . . .

"The test as to whether a judgment in a prior action brought against officers of the state is *res judicata* as against the state in a second action involving the same subject-matter, *depends upon whether the officers have authority to represent the interests of the state* in the prior action. *Sunshine Anthracite Coal Co. v. Adkins,* 310 U. S. 381, 84 L. Ed. 1263, 60 S. Ct. 907." (Italics ours.)

The departments and directors of fisheries and game are charged with the duty of enforcing state laws, and rules and regulations of the departments relative to the conservation of food fish and game fish. The directors have statu-

tory authority to represent and bind the state by their actions, only in matters relating to the conservation of food fish and game fish. Under the statutes, their sole concern is the conservation of food fish and game fish; they are not concerned with ownership of lands by the state in its sovereign capacity.

"The State does not legally become a party to a suit brought on its behalf unless the suit is brought by some officer having statutory authority so to do and a suit brought by the State Tax Collector, which he had no statutory authority to bring is not binding on the State, and the decree therein is not res adjudicata against the State." *State v. Rogers*, 206 Miss. 643, 39 So. (2d) 533 (1949).

In *People v. Birch Securities Co.*, 86 Cal. App. (2d) 703, 196 P. (2d) 143 (1948), the court said:

"It will be observed the former federal judgment, which was offered in evidence as a bar to this action, was merely against certain named officers of the state, as such, and not against the State of California. That case was not a suit against the State of California, and is therefore not res judicata in this action or an estoppel against the state maintaining this action for unpaid franchise taxes. *When a suit is brought only against individually named officers of a state, as such, it is ordinarily not an action against or binding upon the state.*" (Italics ours.)

■ The state became a party defendant to this action on August 8, 1955, subsequent to the first appeal; hence, neither the doctrine of the law of the case, as purportedly established by our first opinion, nor the doctrine of *res judicata* applies to the state of Washington, and this court must consider the question posed.

■ In a recent *En Banc* decision (*State ex rel. Eastvold v. Yelle*, 46 Wn. (2d) 166, 168, 279 P. (2d) 645 (1955)), this court said:

"The power of eminent domain is inherent in sovereignty and does not depend for its existence on a specific grant in the constitution. The provisions found in a state constitution do not by implication grant the power to the government of a state, but limit a power which otherwise would be without limit. *State ex rel. Eastvold v. Superior Court*, 44 Wn. (2d) 607, 609, 269 P. (2d) 560 (1954)."

In *Lauterbach v. Centralia, ante* p. 550, 554, 304 P. (2d) 656 (December 5, 1956), we again defined a municipal corporation and described its powers as follows:

"A municipal corporation is a body politic established by law as an agency of the state—partly to assist in the civil government of the country, but chiefly to regulate and administer the local and internal affairs of the incorporated city, town, or district. *Columbia Irr. Dist. v. Benton County,* 149 Wash. 234, 235, 270 Pac. 813 (1928). *It has neither existence nor power apart from its creator, the legislature,* except such rights as may be granted to municipal corporations by the state constitution." (Italics ours.)

A municipal corporation does not have an inherent power of eminent domain. It may exercise such power only when it is expressly authorized to do so by the *state legislature. Tepley v. Sumerlin,* 46 Wn. (2d) 504, 507, 282 P. (2d) 827 (1955), and cases cited. This is consistent with the general proposition that

". . . a municipal corporation, being but a creature of the state, derives its existence, powers, and duties *from the legislative body* of the state. 37 Am. Jur. 620, §4, and p. 626, § 7. 2 McQuillin, Municipal Corporations (3d ed.) 12, § 4.04; 578, § 10.03." *Othello v. Harder,* 46 Wn. (2d) 747, 752, 284 P. (2d) 1099 (1955). (Italics ours.)

Of course, by statute, the state may delegate the power of eminent domain to one of its political subdivisions; but such statutes are strictly construed. Lewis in 1 Eminent Domain (3d ed.) 679, § 371, states:

"The exercise of the power being against common right, it cannot be implied or inferred from vague or doubtful language, but must be given in express terms or by necessary implication. When the right to exercise the power can only be made out by argument and inference, it does not exist. *'There must be no effort to prove the existence of such high corporate right, else it is in doubt; and, if so, the State has not granted it.'*" (Italics ours.)

This is cited with approval in *State ex rel. Chesterly v. Superior Court,* 19 Wn. (2d) 791, 800, 144 P. (2d) 916 (1944).

It follows, that the state may delegate, to one of its political subdivisions, the power to condemn state-owned property. However,

". . . the principal question that arises in connection with the right of a particular subdivision or agency to take state-owned lands is whether the legislature has authorized such subdivision or agency so to do. This is, of course, a problem of statutory construction, and it may be said in this connection that there is a clear tendency on the part of the courts against interpreting governing statutory provisions in favor of the existence of such authorization *in the absence of a clear expression of the legislative intention to that effect.* This tendency is attributable to such considerations as the general principal of statutory construction that where a statute is general in its terms and thereby any prerogative, right, title, or interest is taken from the state, the latter is not bound unless the statute is made to extend to it by express words; the general rule that property devoted to a public use may not be taken under the power of eminent domain for an inconsistent use unless the right to do so is conferred expressly or by necessary implication." (Italics ours.) Annotation: "Eminent domain: power of one governmental unit or agency to take property of another such unit or agency." 91 L. Ed. 221, 259 (1947).

In *State v. Superior Court,* 91 Wash. 454, 157 Pac. 1097 (1916), this court held that a statute authorizing railroad corporations to condemn lands, including lands granted to the state, refers to state lands held only in a proprietary capacity, and does not include state lands segregated from the public domain and appropriated to a public use by due dedication, saying:

"Indeed, if this be not the rule, the legislature has, by the act in question, granted to railway companies power to condemn any of the state lands for railway purposes (save that of course which is specially exempted), which would include the lands on which its capitol buildings are situated." (p. 459)

The following remark made by this court in *Seattle & Montana Ry. Co. v. State,* 7 Wash. 150, 152, 34 Pac. 551, 38 Am. St. Rep. 866, 22 L. R. A. 217 (1893), is pertinent:

"As well might it be contended that because a railroad is authorized to enter upon and condemn 'any' land for its tracks, depots, shops, round houses, etc., it could, by serving notice upon the auditor of Thurston county, take the entire ten acres upon which the state capitol stands for a depot and shops." (p. 152)

In *State ex rel. Attorney General v. Superior Court*, 36 Wash. 381, 385, 78 Pac. 1011 (1904), this court said:

"Since the rule prevails that condemnation statutes must be strictly construed, as far as they relate to the taking of private property, it follows, with even more force, that the same rule must apply where the lands of the sovereign are sought to be taken." (p. 385)

We deem it conclusively settled in this jurisdiction that a municipal corporation or a public corporation does not have the power to condemn state-owned lands dedicated to a public use, unless that power is clearly and expressly conferred upon it by statute.

 After a careful review of RCW 8.12.030 and RCW 80.40.010, and other statutes to which our attention has been directed, we do not find that the legislature has expressly authorized a municipal corporation to condemn state-owned land previously dedicated to a public use; hence, we conclude that the city of Tacoma has not been endowed with the statutory capacity to condemn such lands.

There remains the subsidiary question: can a municipal corporation of this state be endowed, by Federal legislation, with power to condemn state-owned lands previously dedicated to a public use, in the absence of power and capacity so to act under state statutes; or, specifically, can the city of Tacoma receive the power and capacity to condemn state-owned lands previously dedicated to a public use, from the license issued to it by the Federal power commission in the absence of such power and capacity under state statutes?

This is not a question of the right of the Federal government to control all phases of activity on navigable streams, nor a question of its power, under the Federal power act, to delegate that right. It only questions the capacity of a municipal corporation of this state to act under such license when its exercise requires the condemnation of state-owned property dedicated to a public use.

The question of the legal capacity of the city of Tacoma to act under the license issued by the Federal power commission is specifically excluded from consideration in *State*

*of Washington Department of Game v. Federal Power Comm., supra.* The court said:

"Consistent with the *First Iowa* case, *supra,* we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license or bar the licensees from acting under the license to build a dam on a navigable stream since the stream is under the dominion of the United States. However, *we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted.* There may be limitations in the City Charter, for instance, as to indebtedness limitations. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but the Commission has no power to adjudicate them." (p. 396) (Italics ours.)

Hence, this case is not *res judicata* against the state of Washington. As we have heretofore pointed out, the city does not have the capacity to act under the license. Its inability to act, in the manner which we have discussed, is inherent in its very nature. *Its inability so to act can be remedied only by state legislation that expands its capacity.*

We find nothing inconsistent with this conclusion in *First Iowa Hydro-Electric Cooperative v. Federal Power Comm.,* 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906 (1946). Therein, the court held (rightfully, we believe) that a state could not, by statute, require the petitioner to secure a state permit to build the dam *when the subject matter of the state statutory prohibitions was exclusively within the jurisdiction of the Federal government.* The court said:

"To require the petitioner to secure the actual grant to it of a state permit under § 7767 as a condition precedent to securing a federal license for the same project under the Federal Power Act would vest in the Executive Council of Iowa a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act. It would subordinate to the control of the State the 'comprehensive' planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government." (p. 164)

In *Tacoma v. Taxpayers,* 43 Wn. (2d) 468, 489, 262 P. (2d) 214 (1953), this court said:

"It [the Federal government] intended to exercise its full jurisdiction to authorize the power commission to supersede *state laws purporting to prohibit or limit the construction of dams* on navigable streams." (p. 489) (Italics ours.)

In the instant case, the subject matter—the inherent inability of the city to condemn state lands dedicated to a public use—does not present a question of *state statutory prohibition*; it presents a question of *lack of state statutory power* in the city. It does not present a Federal question; it presents a question peculiarly within the jurisdiction of the state of Washington.

 The Federal government may not confer corporate capacity upon local units of government beyond the capacity given them by their creator, and the Federal power act, as we read it, does not purport to do so.

If it be held that the Federal government may endow a state-created municipality with powers greater than those given it by its creator, the state legislature, a momentous and novel theory of constitutional government has been evolved that will eventually relegate a sovereign state to a position of impotence never contemplated by the framers of our constitutions, state and Federal.

In our review of this case under the declaratory judgment statute (RCW 7.25.010), we are limited in our consideration by the plan of construction established by the ordinances of the city of Tacoma, and the license the city of Tacoma received from the Federal power commission, as they appear in the record before us. It is not within the province of this court to give an advisory opinion as to what the law may be under a different plan of construction, which may be established by different ordinances or licenses.

Based upon the present record, we agree with that portion of the judgment of the trial court which determines (1) that the question of damage to fish which might result from construction of the dams is not now a proper one for

the consideration of the court; and (2) that Laws of 1917, chapter 117, §§ 27 and 36, pp. 459, 463, as amended (RCW 90.20.010—state permit for appropriation of water; RCW 90.28.060—state permission to build a dam), Laws of 1949, chapter 9, p. 38 (RCW 75.20.010 *et seq.*—establishing Columbia river fish sanctuary), and Laws of 1949, chapter 112, §§ 46 and 49, pp. 272, 274, as amended (RCW 75.20.050— state permit to divert water; RCW 75.20.100—approval of building plans for the protection of fish), are

" . . . inapplicable to said project insofar as the same conflict with the provisions of the Federal Power Act or the terms and conditions of plaintiff's License for said project, or insofar as they would enable State officials to exercise a veto over said project."

Our conclusion is amply supported by *First Iowa Hydro-Electric Cooperative v. Federal Power Comm.*, 328 U.S. 152, 90 L. Ed. 1143, 66 S. Ct. 906 (1946).

The same authority supports the conclusion that the trial court erred when it issued the injunction

" . . . for the reason that said project would necessarily impede, obstruct or interfere with public navigation contrary to the proviso of R.C.W. 80.40.010 et seq."

■■■ However, we have held on many occasions that if the judgment of the trial court is based upon erroneous grounds, it will be sustained, if correct on any grounds within the pleadings and established by the proof. *Ennis v. Ring, ante* p. 284, 289, 300 P. (2d) 773 (1956).

We have already held that the question of the capacity of the plaintiff to acquire property of the state of Washington by eminent domain is within the jurisdiction of the court; and that the city of Tacoma has not been endowed with the statutory capacity to condemn state lands previously dedicated to a public use. Without this power, it cannot accomplish the plan set forth in the city ordinances before us; hence, for the reasons we have discussed herein, the judgment of the superior court is affirmed.

HILL, C. J., SCHWELLENBACH, ROSELLINI, and OTT, JJ., concur.

HILL, C. J. (concurring specially)—I have signed the majority opinion, but in fairness to all concerned it should be stated that this case had been assigned to one of the judges whose opinion did not prevail, and the case was not assigned to Judge Weaver for opinion until January 11, 1957.

DONWORTH, J. (dissenting)—I find myself in disagreement with the majority opinion for three reasons, which are stated below. Because of the importance of the constitutional question relating to the conflict between state and Federal powers, I deem it proper to state my views at some length.

My first two reasons, if valid, make it unnecessary to consider the third reason (the constitutional question). They are:

First, respondents (taxpayers of Tacoma) and cross-appellants (directors of fisheries and game, respectively) are precluded from raising the constitutional question because the law of the case was established on the first appeal (43 Wn. (2d) 468, 262 P. (2d) 214).

Second, the state is precluded from raising that question because it and cross-appellants are bound by the decision of the court of appeals for the ninth circuit in *State of Washington Department of Game v. Federal Power Comm.*, 207 F. (2d) 391, which is *res judicata* of this controversy.

The third reason is that, even assuming *arguendo* that the two doctrines of the law of the case and *res judicata* are not applicable, the majority opinion is in error in holding that appellant, under the facts shown in this record, has no power to condemn state-owned lands previously dedicated to public use when the legislature has not given it the power to so act.

In considering the first reason stated above, it is necessary to have in mind the issues which were raised or could have been raised on the first appeal (43 Wn. (2d) 468). The demurrer to the complaint which was before this court on the first appeal admitted all facts well pleaded therein and reasonable inferences to be drawn therefrom. *Slater v. Bird*, 40 Wn. (2d) 848, 246 P. (2d) 460, and cases cited.

The demurrer admitted (among other things) that the Federal power commission, in its order of November 28, 1951, had made sixty-six findings of fact, including No. 53 and No. 59, reading as follows:

"The Applicant is a municipal corporation; it has submitted satisfactory evidence of compliance with the requirements of all applicable State laws insofar as necessary to effect the purposes of a license for the project; and it is a municipality within the meaning of Section 3(7) of the Act.

"Under present circumstances and conditions and upon the terms and conditions hereinafter included in the license, the project is best adapted to a comprehensive plan for improving or developing the waterway involved for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the conservation and preservation of fish and wildlife resources, and for other beneficial public uses including recreational purposes."

Appellant alleged in its original complaint that ordinance No. 14386, in which it adopted the plan and system therein described and designated as the Cowlitz power development, provided for the acquisition of certain lands by purchase or condemnation. The lands which were to be affected by the project were described in the complaint as follows:

"Acquisition by purchase, condemnation, or otherwise of 16,000 acres of land, more or less, for dam sites, powerhouse sites, *reservoirs and storage basin sites,* operator's villages, tunnels, construction offices; fishways, fish hatcheries and other fish facilities, gravel pits, roads, bridges and necessary right of ways, said lands being located in

"Sections 1, 2, 3, 9, 10, 11, 16, 19, 20, 21, 27, 28, 29 and 30 of Township 12 North, Range 2 East of Willamette Meridian; Sections 25, 26, 34 and 35 of Township 13 North, Range 2 East, W. M.; Sections 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 22, 23 and 24 of Township 12 North, Range 3 East, W. M.; Sections 7, 18, 19, 20, 27, 28, 29, 30, 32, 33, 34, 35 and 36 of Township 12 North, Range 4 East, W. M.; Sections 1, 2, 3, 4, 11 and 12 of Township 11 North, Range 4 East, W. M.; Sections 28, 29, 30, 31, 32, 33 and 34 of Township 12 North, Range 5 East, W. M.; and Sections 2, 3, 4, 5 and 6 of Township 11 North, Range 5 East, W. M.; all of said lands being located in Lewis County of the State of Washington,

*also acquisition of right of ways for relocation of those portions of state,* county and private roads and *highways,* and telephone and power lines *inundated by storage water impounded behind said dams;* acquisition of right of ways for such spur railroad tracks or access roads as may be required to be extended from the closest feasible point on available railroads or public highways to a point at or near said dam sites; *acquisition of such fish hatchery sites and water rights as may be required by the Federal Power Commission; . . .*" (Italics mine.)

From this legal description (contained in the original complaint) of the lands to be taken, damaged, or inundated by the reservoirs and storage basin sites, which included state lands devoted to public uses, respondents were charged with notice of the nature and extent of appellant's proposed condemnation proceedings.

Respondents state in their brief that:

". . . Also there is no reference in the remotest sense in the city's original complaint that any state land either previously dedicated to public use, or not, is to be taken. . . ."

I cannot agree with this statement. Under the allegations of the original complaint, respondents were as well able in 1952 to ascertain the nature and ownership of the land sought to be damaged or to be taken by appellant as they were in 1955, when they first asserted this contention in the instant case in their answer and affirmative defense.

Respondents could have and should have raised, by demurrer or otherwise, when this case was first instituted, the question as to the power of appellant to condemn state lands devoted to a public use. Not having done so, respondents should be precluded from litigating that question in the present case. A pertinent application of the law of the case doctrine is found in the case of *Smith v. Seattle,* 20 Wash. 613, 56 Pac. 389, and the following portion of that decision is directly in point:

"Respondent urges as a preliminary consideration, that the complaint does not state a cause of action, but we think it cannot be permitted to urge the point. This cause was here on a former appeal by the plaintiff from an order of

the lower court which sustained a general demurrer to the complaint. (See *Smith v. Seattle*, 18 Wash. 484, 51 Pac. 1057 63 Am. St. Rep. 910, for a full statement of the case.) That order was reversed, this court concluding that the complaint was sufficient. It is true that the ground upon which the respondent now seeks to attack the complaint was not presented on the former appeal, and, inasmuch as the point was not presented nor passed upon at that time, counsel for the city insist that they have a right to urge it now. While it is true that the point was not·raised on the former appeal, it is patent that it might have been, and we think it would be a bad and unwarranted practice to permit the point to be urged now. In support of its general demurrer, respondent was entitled to urge the insufficiency of the complaint from any standpoint, and must be held to have waived every point not presented at the former hearing. Any other practice would result in cases coming here piecemeal, delaying litigation, increasing the expense to parties litigant and burdening the court with unnecessary labor. It would be productive of much mischief and cannot be tolerated."

The rule is that questions which have been determined on a prior appeal, or which might have been determined had they been presented, will not be considered by the appellate court upon a second appeal of the same action. *Buob v. Feenaughty Machinery Co.*, 4 Wn. (2d) 276, 103 P. (2d) 325, and cases cited; *Gray v. Wikstrom Motors,* 18 Wn. (2d) 795, 140 P. (2d) 497.

It is also clear that the question of the plenary power of the legislature over municipal corporations was directly in issue in *Tacoma v. Taxpayers, supra.* Judge Hamley, in his dissenting opinion, made the same argument which the majority relies upon in the case at bar, as follows:

"The Federal government may not confer corporate powers upon local units of government, and the Federal power act does not purport to do so. The supersedure, if any, with respect to the exertion of police power, does not affect applicability of chapter 9 as an exercise of the other power named, for, in my view, the legislature would have intended the act to remain in force in the latter regard had the matter of supersedure been called to its attention.

"That the legislature may restrict the powers of municipalities, is beyond question. Cities are limited governmental

arms of the state. *Russell v. Grandview,* 39 Wn. (2d) 551, 236 P. (2d) 1061. They may exercise only those powers which are granted to them in the state constitution or statutes. Except as limited by the constitution, legislative control over municipalities is therefore plenary. *State v. Aberdeen,* 34 Wash. 61, 74 Pac. 1022; *Wheeler School Dist. v. Hawley,* 18 Wn. (2d) 37, 137 P. (2d) 1010. It follows that the legislature may enlarge or diminish powers already granted to such subordinate units of government. *State ex rel. Nat. Bank of Tacoma v. Tacoma,* 97 Wash. 190, 166 Pac. 66."

Cross-appellants and the state advance substantially the same arguments as respondents relative to the law of the case, and therefore, without further discussion of that point, it is my opinion that these parties are bound by that doctrine for the reasons above stated. The state's further contention that it was not then a party in *Tacoma v. Taxpayers, supra,* and therefore not bound by the law of the case, is untenable, for the reasons hereinafter stated on the question of *res judicata.*

Turning now to my second reason for dissenting, to wit, that cross-appellants and the state are bound by the doctrine of *res judicata,* I wish to refer to certain undisputed facts shown in the record.

Appellant pleaded in its reply that the decision of the court of appeals for the ninth circuit in *State of Washington Department of Game v. Federal Power Comm., supra,* was a bar to the position now taken by cross-appellants and the state in this court.

In 1948, appellant filed its declaration of intention to construct the Cowlitz project and followed this with its application to the Federal power commission for a license under the Federal power act (16 U.S.C.A., § 791 *et seq.*). As required by the act, notice was served upon the state, in response to which the attorney general filed a petition to intervene upon behalf of the departments of fish and game of the state of Washington. The petition alleged that the state of Washington was a sovereign state of the United States, and that the state of Washington department of game and state of Washington department of fisheries were each

a department and subdivision thereof, charged with the duty of enforcing its laws, rules, and regulations relative to the conservation of food fish and game fish. The petition contained this allegation in paragraph nine:

"That the reservoirs which would be created by the proposed dams would inundate a valuable and irreplacable fish hatchery owned by the State of Washington, as well as much productive spawning areas."

In addition, there was a petition for intervention filed on behalf of Washington State Sportsmen's Council, Inc., a nonprofit corporation, in opposition to the granting of a license to appellant. This petition contained an allegation identical to that last above quoted. Appellant's answer to this petition admitted the allegation. Both petitions for intervention were allowed.

Upon the issues thus framed, hearings were thereafter held before a presiding examiner of the Federal power commission, which consumed twenty-four days. An assistant attorney general, designated by his superior for the purpose, participated in these hearings and vigorously opposed appellant's application for a license. The attorney for the Sportsmen's Council did likewise.

During the proceedings, the assistant attorney general called Robert Meigs, assistant chief of the fish management division for the Washington state department of game, to testify on behalf of interveners. His testimony was, in part, as follows:

"Q. Now, does the State of Washington Game Department have a hatchery on the Cowlitz watershed? A. Yes, we have what we refer to as the Mossyrock Hatchery, which is located a short distance from Mossyrock, Washington. [3348] Q. Is it within the area that would be inundated by these dams? A. According to information furnished us by Tacoma, the flood line from the Mayfield reservoir would extend some 400 feet past the hatchery and would flood it out. Mr. Mason: You mean 400 feet vertically or horizontally? The Witness: That I don't recall. I don't think vertically; horizontally."

Thus the proposed inundation of the Mossyrock hatchery, owned and operated by the state of Washington, was not

only admitted in the pleadings but was proven by undisputed evidence. Furthermore, it is indisputable that the flooding of the state's hatchery was an obvious part of the comprehensive scheme of the development of the Cowlitz river, which appellant was asking the power commission to approve in granting the city the license for which it was applying.

At the conclusion of the hearings, the presiding examiner recommended against issuance of the license. Appellant filed exceptions, and the matter was argued orally by all parties before the commission.

Thereafter, the Federal power commission made findings of fact, rendered an opinion, and issued the license to appellant.

Interveners filed a petition for rehearing before the commission, which was denied January 24, 1952.

On March 12, 1952, the state departments of game and fisheries et al. filed, in the United States court of appeals for the ninth circuit, a petition for review of the orders of the Federal power commission. The printed record in that case comprises 4,392 pages. One of the principal points relied upon by petitioners for annulment of commission's order was stated in the petition for review, as follows:

"Finding No. 53 by the Commission is not supported by substantial evidence and is contrary to Section 9(b) and 27 of the Federal Power Act in that Applicant has not complied with the Water Code of the State of Washington as required by said sections."

After setting forth the pertinent findings of the commission, and following a discussion of *First Iowa Hydro-Electric Cooperative v. Federal Power Comm.*, 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906, the court of appeals answered this contention as follows:

"The Commission in our case acted within the scope of its discretion in not requiring Tacoma to show compliance with the laws of the State of Washington regulating the construction of dams in Washington, because compliance with those laws would have prevented the development of the Cowlitz Project; and in the opinion of the Commis-

sion of the Cowlitz Project was 'best adapted to a comprehensive plan' for the development of a concededly navigable stream. The Federal Government's Constitutional authority to regulate commerce and navigation includes the 'power to control the erection of structures in navigable waters', *United States v. Appalachian Power Co.,* 1940, 311 U. S. 377, 405, 61 S. Ct. 291, 298, 85 L. Ed. 243. The Federal Government's power over navigable waters is superior to that of the state. *McCready v. Virginia,* 1876, 94 U. S. 391, 24 L. Ed. 248.

"The objectors further contend that Tacoma, as a creature of the State of Washington, cannot act in opposition to the policy of the State or in derogation of its laws.

"Again, we turn to the *First Iowa* case, *supra.* There, too, the applicant for a federal license was a creature of the state and the chief opposition came from the state itself. Yet, the Supreme Court permitted the applicant to act inconsistently with the declared policy of its creator, and to prevail in obtaining a license.

"Consistent with the *First Iowa* case, *supra,* we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license or bar the licensee from acting under the license to build a dam on a navigable stream since the stream is under the dominion of the United States. However, we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted. There may be limitations in the City Charter, for instance, as to indebtedness limitations. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but the Commission has no power to adjudicate them." *State of Washington Department of Game v. Federal Power Comm.* 207 F. (2d) 391.

In the last paragraph above quoted, the court of appeals implied that there might be a question of municipal indebtedness limitation or some other related question involved, and cited the case of *Tacoma v. Taxpayers, supra,* then pending in this court. No such question was raised in that case on the first appeal or subsequently.

The state laws which the court of appeals held were not a bar to construction of the Cowlitz project were the same laws passed upon by this court in *Tacoma v. Taxpayers,*

*supra, viz.,* the Columbia river fish sanctuary act and the fisheries code.

The court of appeals declined to overturn *any* of the commission's findings which were attacked by the petitioners. The court found that these findings (including Nos. 53 and 59, above quoted) were supported by substantial evidence and declined to interfere with the commission's order granting the license to the city of Tacoma.

The petitioners' petition for certiorari to the United States supreme court was denied on April 5, 1954. *Washington Department of Game v. Federal Power Comm.,* 347 U. S. 936, 98 L. Ed. 1087, 74 S. Ct. 626.

Cross-appellants and the state now vigorously attempt to avoid the effect of the two prior appeals in this litigation. They state in their brief:

" . . . We will, however, limit our remarks to the state of the pleadings after August 8, 1955, since this was the date on which the court, in the proper exercise of its discretion, granted the City's request to file an amended complaint and also permitted the *State of Washington in its sovereign capacity* to be added as a party defendant. At this point, with respect to the state of the pleadings, *this was a fresh lawsuit,* and we believe any discussion of former pleadings would be immaterial. . . ." (Italics mine.)

The only purpose in filing appellant's amended complaint was to incorporate an allegation that appellant's license had been amended to grant appellant a two-year extension of time within which to commence construction of the Cowlitz project, and to incorporate two minor amendments of ordinance No. 14386. There was no material change in the pleadings.

The real crux of the argument advanced seems to be that, by adding the "Sovereign State of Washington" as a party in the present case, it became a new and independent lawsuit. This position cannot be sustained.

In *State v. Pacific Tel. & Tel. Co.,* 9 Wn. (2d) 11, 113 P. (2d) 542, the state of Washington attempted to maintain a suit to recover the state compensating or use tax on goods purchased outside this state by defendant. In a previous suit,

defendant had obtained a judgment enjoining collection of the tax by the tax commissioners of the state of Washington. (*Pacific Tel. & Tel. Co. v. Henneford,* 195 Wash. 533, 81 P. (2d) 786.) On appeal, this court held that the tax was an unlawful burden on interstate commerce. The question presented in the second case was whether the first suit was *res judicata,* and this question depended upon whether or not the state of Washington was actually a party in the first suit, even though that suit had been maintained against the tax commissioners. The court stated:

"The general rule is that a judgment for or against the state or an officer or agency thereof in matters as to which such officer or agency is entitled to represent the state in litigation, is conclusive for or against the state."

After discussing the pertinent statutes, the court concluded that the tax commissioners were authorized to represent the state in collection of the use tax, and that the judgment in the prior action was *res judicata* as against the state in the second action.

In the case at bar, the director of fisheries and the director of game are charged with the duty of enforcing the rules and regulations of their respective departments relative to the conservation and preservation of food fish and of game fish. See RCW 75.08.080 and RCW 77.04.080.

Further powers and duties of the director of fisheries are as follows: He has authority to enter into agreements with the department of defense relative to co-ordinating and correlating the control of fishing in the waters of the state, over which the department of defense has assumed control (RCW 75.08.025); the power to establish and maintain state fish hatcheries, rearing stations, eyeing stations, brood ponds, and other facilities as in his judgment may be necessary for the exercise of his powers (RCW 75.08.030); the authority to accept money from municipalities, or other governmental units, in settlement of any claim for damages to food fish resources, and he is by statute designated the agent of the state to accept and receive all such funds and deposit them with the state treasurer (RCW 75.16.050). The director

of game has similar powers conferred upon him by statute (RCW 77.12.200, 77.12.210, 77.12.220).

Under authority of these statutes, I am of the opinion that the directors of fisheries and of game, as agents of the state, are vitally interested in the continued existence of the Mossyrock hatchery. Their interest therein is not personal, nor is it an interest different from that of the sovereign state. The departments of fisheries and of game are but limited subdivisions of the state itself. They do not exist as entities *sui juris*, as does, for example, the state power commission. Therefore, the Mossyrock hatchery, which is concededly owned by the state, is under the jurisdiction of the departments of fisheries and of game, but they exercise control over it merely as agents of the state.

The directors of fisheries and of game were, therefore, properly joined as parties to the proceedings herein, and, under the rule announced in *State v. Pacific Tel. & Tel Co.*, *supra*, it was their duty to represent the state. I conclude that the litigation in this court, as well as in *State of Washington Department of Game v. Federal Power Comm.*, *supra*, has at all times been an action against the state.

There is another basis for my conclusion that the state has been represented at all times in this action. The attorney general designated certain of his assistants to represent the departments of fisheries and of game in this litigation, in accordance with the following pertinent statutes.

RCW 43.10.030, defining the powers and duties of the attorney general, provides that he shall:

"(1) Appear for and represent the state before the courts in all cases in which the state is interested;

"(2) Institute and prosecute all actions and proceedings for, or for the use of the state, which may be necessary in the execution of the duties of any state officer;

"(3) Defend all actions and proceedings against any state officer in his official capacity, in any of the courts of this state or the United States; . . .

"(5) Consult with and advise the governor, members of the legislature and other state officers, and when requested, give written opinions upon all constitutional or legal questions relating to the duties of such officers; . . ."

Under RCW 43.10.040, it is further provided that:

"The attorney general shall also represent the state and all officials, departments, boards, commissions and agencies of the state in the courts, and before all administrative tribunals or bodies of any nature, in all legal or quasi legal matters, hearings, or proceedings, and advise all officials, departments, boards, commissions, or agencies of the state in all matters involving legal or. quasi legal questions, except those declared by law to be the duty of the prosecuting attorney of any county."

Under the authority of these statutes, the state of Washington was represented by its attorney general, both before the commission and the court of appeals.

"The Attorney General for the State appointed a special assistant attorney general to represent all persons not otherwise represented whose views were in conflict with the State Departments of Game and Fisheries. Thus, the State of Washington by its Attorney General, and the people of Washington holding views not in harmony with the State's official position, and the applicant City of Tacoma were represented at the hearing which was had before an Examiner." *State of Washington Department of Game v. Federal Power Comm.*, 207 F. (2d) 391, 393.

He could and should have raised, before the Federal power commission and the court of appeals, the objection that appellant did not have statutory authority to condemn state lands devoted to public uses.

It is the purpose of the law that where issues have once been litigated and decided, the litigation shall then be at an end.

Where a party has had a full opportunity to present all the defenses at his command, and fails to do so, the doctrine of *res judicata* applies. *Symington v. Hudson,* 40 Wn. (2d) 331, 243 P. (2d) 484.

This doctrine was applied by the supreme court of the United States in *Commissioner of Internal Revenue v. Sunnen,* 333 U. S. 591, 92 L. Ed. 898, 68 S. Ct. 715, where it was said:

"It is first necessary to understand something of the recognized meaning and scope of *res judicata,* a doctrine

judicial in origin. The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' *Cromwell v. County of Sac,* 94 U. S. 351, 352. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. See Von Moschzisker, 'Res Judicata,' 38 Yale L. J. 299; Restatement of the Law of Judgments, §§ 47, 48."

The rule above stated is directly applicable in this case. In *State of Washington Department of Game v. Federal Power Comm., supra,* the pleadings admitted, and the proof established, that the Mossyrock hatchery would be inundated and, of necessity, taken by condemnation proceedings. The final judgment entered in that case is, therefore, binding upon cross-appellants and the state as to the issue of condemnation, which they now contend is before this court for the first time.

Neither the entry of new counsel into the case nor the addition of a sovereign state as a party defendant, after its duly appointed representatives had lost the case, changes the character of the lawsuit. I am of the opinion that the decision of the court of appeals for the ninth circuit, in the case of *State of Washington Department of Game v. Federal Power Comm., supra,* is *res judicata* as against both cross-appellants and the state.

Assuming *arguendo* that neither the doctrine of the law of the case nor the doctrine of *res judicata* applies to the facts before us, then my third reason for dissenting is that the majority has misconstrued the Federal power act and has failed to give it the supremacy over state laws which should be accorded it under the commerce clause of the United States constitution.

I am entirely in agreement with the majority in its statement of the general rule that a municipality is a creature of the legislature, and that its powers (including that of eminent domain) are derived from the legislature or the constitution. It has no power of eminent domain except as granted by the legislature. But, in this case (as stated on the first appeal), the power of Congress, under the commerce clause, is superior to that of the state when Congress exercises its power as it did in enacting the Federal power act.

The two principal decisions of the United States supreme court construing the power act and its supremacy under the commerce clause were discussed in this court's opinion on the first appeal. They are *United States v. Appalachian Electric Power Co.*, 311 U. S. 377, 85 L. Ed. 243, 61 S. Ct. 291, and *First Iowa Hydro-Electric Cooperative v. Federal Power Comm.*, 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906. These two decisions will herein be referred to as the *Appalachian* case and the *First Iowa* case, respectively.

Bearing in mind the holding in these two cases that Congress has plenary power over navigable waters, and that it may deny, or grant, on such terms as it sees fit, the privilege of constructing dams therein, I wish to invite attention to certain provisions of the Federal power act (41 Stat. 1063).

In § 4 (e) (16 U.S.C.A. § 797), the Federal power commission (herein referred to as the commission) was authorized to issue licenses for the construction of dams and appurtenances to certain entities, including "any state or municipality." In the preceding § 3, Congress defined the term "municipality" as follows:

" 'municipality' means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power; . . ."

Under § 6 (16 U.S.C.A. § 799), the commission may issue such licenses for a period not exceeding fifty years which may be conditioned upon the acceptance by the licensee of

certain terms and conditions stated in the act and of any others that may be prescribed by the commission pursuant thereto.

Section 9 (16 U.S.C.A. § 802) provides:

"Each applicant for a license under this chapter shall submit to the commission—

"(a) Such maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project. Such maps, plans, and specifications when approved by the commission shall be made a part of the license; and thereafter no change shall be made in said maps, plans, or specifications until such changes shall have been approved and made a part of such license by the commission.

"(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter.

"(c) Such additional information as the commission may require."

Section 10 (16 U.S.C.A. § 803) prescribes certain conditions on which all licenses shall be issued. Subdivision (a) thereof reads as follows:

"That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

By § 14 (16 U.S.C.A. § 807), the United States is granted an option to purchase any project upon or after the expiration of the license upon payment of the net investment of

the licensee if the purchase price be not mutually agreed upon by the parties. The term "net investment" is defined in § 3 of the act (16 U.S.C.A. § 796).

Licensees are granted the power of eminent domain in § 21 (16 U.S.C.A. § 814) in the following language:

"When any licensee cannot acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such land or other property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated; *Provided*, That United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000."

Without further reviewing the provisions of the Federal power act, it is apparent that Congress intended to and did exercise its full power under the commerce clause in providing for the licensing of the projects described therein. When the power commission has made a finding as required by § 9 (b) that the licensee has complied with state laws with respect to the right to engage in the business of developing, transmitting, and distributing electric power and any other business necessary to effect the purposes of the licensee under the act, then the licensee becomes the agent of the Federal government in regard to the project. Upon the issuance of the license, all rights and obligations of the licensee are derived from congressional constitutional powers, and not those of the state where the project is located. See *First Iowa* case.

The project for which the license is issued is a Federal project and is to be considered as if it were to be constructed and operated by the government itself. The government has an option to buy the project works at the end of the license period, as provided in § 14 of the act. Every detail of the project must be carried out by the licensee in strict accordance with the terms of the license and the maps and drawings identified therein. The comprehensive plan adopted by the power commission for the development of the waterway may not be deviated from by a licensee without permission of the commission.

The licensee derives the power of eminent domain from § 21 of the act (quoted above). Long before the passage of the act, Congress, in 1906 (34 Stat. 462), enacted a special act authorizing the city of St. Louis to construct a bridge across the Mississippi river in accordance with the general bridge act. With respect to the exercise of the power of eminent domain, § 2 of the special act provided:

"That for the purpose of carrying into effect the objects of this Act, the city of Saint Louis may receive, purchase, and also acquire by lawful appropriation and condemnation in the States of Illinois and Missouri, upon making proper compensation, to be ascertained according to the laws of the State within which the same is located, real and personal property and rights of property, and may make any and every use of the same necessary and proper for the construction, maintenance, and operation of said bridge and approaches consistent with the laws of the United States and of the said States respectively."

The authority of St. Louis to condemn lands for bridge approaches in Illinois was challenged. In *Latinette v. St. Louis*, 201 Fed. 676, the circuit court of appeals (7th cir.) disposed of this challenge by saying:

"Only consent was given by section 1 of this latter act to build the bridge in the manner and on the conditions expressed in the general bridge statute. Authority to exercise the sovereign power of appropriation, if given at all, was conferred in section 2. Appellant's contention is that the words 'according to the laws of the state' show that Congress meant that St. Louis should not have power to condemn except by virtue of state law, and that, inasmuch

as Illinois refuses to give St. Louis the power, the judgment must be reversed. But, looking to the construction of the sentence, it seems clear to us that only the 'compensation' is 'to be ascertained according to the laws of the state.' Furthermore, while Congress might tell its agent to go to the state law for the rules of practice, *it could not constitutionally effect anything by telling its agent to go to the state law for power to condemn land for a national purpose.* Condemnation is an attribute of sovereignty. It must be exercised directly by the sovereign or through an agency appointed by the sovereign. Neither the power nor the selection of agents can be transferred to another. States have the power only for state purposes; the nation, only for national purposes. *So, the power to condemn mentioned in section 2 must be referred to the national power.* And finally, Congress in framing section 2 used a formula of expression which had already been judicially construed. In *Luxton v. North River Bridge Co.*, 153 U. S. 525, 14 Sup. Ct. 891, 38 L. Ed. 808, the act provided that the bridge company might 'acquire by lawful appropriation and condemnation, upon making proper compensation therefor, to be ascertained according to the laws of the state within which the same is located, real and personal property and rights of property'; and these words, the same as in the case at bar, were held to relate to the national power.

*"Contention is therefor narrowed to this: That Congress could not constitutionally select appellee as the agency through which a national power should be exercised. Nothing in the Constitution forbids the selection of a state corporation as a national agent. In reason the material thing is the principal's authority, not the parentage or birthplace of the agent.* And the decisions of Mr. Justice Bradley at circuit in *Stockton v. B. & N. Rld. Co.* (C. C.) 32 Fed. 9, and of the Supreme Court in *Cherokee Nation v. Kansas Ry. Co.*, 135 U. S. 641, 10 Sup. Ct. 965, 34 L. Ed. 295, explicitly cover the point." (Italics mine.)

Another case which does involve the right of a licensee under the act to exercise the power of eminent domain is *State of Missouri ex rel. Camden County v. Union Electric Light & Power Co.*, 42 F. (2d) 692. There, a private utility corporation had received a license from the power commission to build a dam for the purpose of producing hydroelectric power. The plan contemplated a dam which

" . . . would inevitably create an immense reservoir and cause the inundation of vast tracts and bodies of land, the submergence of many public highways and school districts, and the permanent overflow of the village of Linn Creek in Camden county, which is now the county seat of said county; and that the courthouse and other public property situated in said Linn Creek would be flooded and rendered useless."

The state of Missouri and Camden county brought an action in the United States district court to enjoin the construction of the proposed dam. After discussing the power of Congress under the commerce clause and the effect of the Federal water power act of 1920 (prior to the 1935 amendment), the court considered § 21, relating to the power of eminent domain as it related to property already devoted to a public use. After quoting § 21, the court said:

"The licensee has been granted the power to acquire property by the exercise of eminent domain in express terms. Concededly this right may be exercised as against private property.

" 'Public lands,' as used in the act, refers only to lands owned by the United States. The only question, therefore, that is here presented is whether the right of eminent domain may be exercised against property already dedicated to a public use when situated within the proposed reservoir and to be affected by the improvement.

"While it is well settled that the Legislature may authorize the taking of property already devoted to a public use, it is equally well established that a general delegation of the power of eminent domain does not authorize the taking of property already devoted to a public use, *unless it can clearly be inferred from the nature of the improvements authorized or from the impracticability of constructing them without encroaching upon such property that the legislature intended to authorize such a taking.*' 10 R. C. L. § 169; Western Union Telegraph Co. v. Pennsylvania R. R. Co. et al., 195 U. S. 540, 25 S. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517. In this connection it cannot be questioned but that the Congress had the power to confer the right of eminent domain upon the defendant Union Electric Light & Power Company. 10 R. C. L. § 167.

"In the instant case the Congress must have contemplated this identical situation; hence the requirement of notice.

Moreover, the proposed improvements could not be accomplished, except through the exercise, if necessary, of eminent domain against property already dedicated to public use. *To deny the right of eminent domain as against this public property would not only defeat the functions of the national government, but would run contrary to the obvious intent of the Congress as expressed in the Water Power Act.* Stockton, Attorney General, v. Baltimore & New York R. R. Co. (C. C.) 32 F. 9; 20 C. J. § 90, P. 602; Vermont Hydro-Electric Corporation v. Dunn et al., 95 Vt. 144, 112 A. 223, 12 A. L. R. 1495; Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 575, Ann. Cas. 1914B, 322.

"It is not within the judicial power to question the purpose for which property is to be taken under the power of eminent domain. The necessity for the taking is not a judicial question, but is exclusively within the power of Congress and one which it may determine by direct enactment or by delegating the power to some officer or board. Kaw Valley Drainage District of Wyandotte County, Kansas, et al. v. Metropolitan Water Co. (C. C. A.) 186 F. 315." (Last italics mine.)

The state's prayer for an injunction to prevent the flooding of the public property within the proposed reservoir was denied.

The majority opinion holds that the state of Washington may now, at this late date, appear in this declaratory judgment action and obtain a declaration that appellant may not condemn the right to flood the Mossyrock hatchery because the legislature has not authorized such a proceeding.

In my opinion, the assertion comes too late, because the power commission, in a proceeding before it (to which the state was a party), found (finding No. 53) that appellant had authority under state law to do everything necessary to carry out the provisions of the license granted it. The record showed that the acquisition of the right to flood this state-owned hatchery was an essential part of the comprehensive plan for the development of the Cowlitz river, which the power commission had approved and for which the license was issued to appellant. As previously stated, the state's challenge of this finding was overruled by the court of appeals for the ninth circuit (207 F. (2d) 391). To

uphold the state's contention in the present case, is to over-rule the decision of a Federal court in a matter over which it had jurisdiction. It seems to me that considerations of comity forbid our doing so.

But the most serious error in the majority opinion (as I see it) is the disregard of the constitutional separation of state and Federal powers as recognized by the supreme court's decisions in the *Appalachian* and *First Iowa* cases. It would extend this opinion beyond all permissible limits to review those decisions in detail. The supreme court plainly held that the power commission had sole jurisdiction to determine whether a licensee had authority under state laws to carry out the terms of its license.

This holding is emphasized by the dissenting opinion of Justice Frankfurter, who did not disagree with the court's interpretation of the Federal power act nor the constitutional power of Congress to enact it. He felt that under § 9 (b) the power commission should not make a finding regarding state laws until the state courts had interpreted them. This is clear from the following portion of his dissenting opinion:

"By § 9 (b) of the Act, 41 Stat. 1063, 1068; 16 U. S. C. § 802 (b), Congress explicitly required that before the Commission can issue a license for the construction of a hydro-electric development, such as the proposed project of the petitioner, the Commission must have 'satisfactory evidence that the applicant has complied with the requirements of the laws of the State' in reference to the matters enumerated.

"Whether the Commission has such 'satisfactory evidence' necessarily depends upon what the requirements of State law are. In turn, what the requirements of State law are often depends upon the appropriate but unsettled construction of State law. And so, the Commission may well be confronted, as it was in this case, with the necessity of determining what the State law requires before it can determine whether the applicant has satisfied it, and therefore, whether the condition for exercising the Commission's power has been fulfilled.

"To safeguard the interests of the States thus protected by § 9 (b), Congress has directed that notice be given to the State when an application has been filed for a license,

the granting of which may especially affect a State. Section 4(f), 49 Stat. 838, 841; 16 U.S.C. § 797(f). *If a State does not challenge the claim of an applicant, the evidence submitted by the applicant, if found to be satisfactory by the Commission, has met the demands of § 9(b), and a State cannot thereafter challenge the Commission's determination.*" (Italics mine.)

The majority of that court in the *First Iowa* case did not indicate any disagreement with the italicized portion of the dissent quoted. The majority were of the view that the commission could make findings under § 9(b) in the absence of state court decisions interpreting state statutes. We are, of course, bound by the majority decision.

To hold otherwise is to permit the state of Washington to exercise a veto as to the project involved in the case before us by saying that the power commission was wrong in finding that the city of Tacoma had authority under state law to construct these dams, because the city has no authority to condemn the right to flood the state's fish hatchery. Under the decision in the *First Iowa* case, the power commission has exclusive jurisdiction to make a finding whether a licensee has authority under state law *to engage in the power business.* (§ 9(b)). The power commission has made that finding (the circuit court refused to set aside the finding), so that factual issue was permanently and effectively settled.

The Federal power act in § 21 affords a licensee ample authority as an agent of the Federal government to exercise the power of eminent domain without state authority. A state may not deny or impair this authority once a license has been issued.

The majority opinion concludes with the following statement of its decision on the constitutional question presented:

"In the instant case, the subject matter—the inherent inability of the city to condemn state lands dedicated to a public use—does not present a question of *state statutory prohibition*; it presents a question of *lack of state statutory power* in the city. It does not present a Federal question;

it presents a question peculiarly within the jurisdiction of the state of Washington.

"The Federal government may not confer corporate capacity upon local units of government beyond the capacity given them by their creator, and the Federal power act, as we read it, does not purport to do so.

"If it be held that the Federal government may endow a state-created municipality with powers greater than those given it by its creator, the state legislature, a momentous and novel theory of constitutional government has been evolved that will eventually relegate a sovereign state to a position of impotence never contemplated by the framers of our constitutions, state and Federal."

However much I might agree with the majority's statement in the last paragraph above quoted as to the effect of such a holding on the powers of a sovereign state, several decisions of the United States supreme court rendered in the past twenty-five years construing the commerce clause (in addition to the *Appalachian* and *First Iowa* cases) compel my dissent from the majority holding as stated in the first two paragraphs of the quotation.

An excellent discussion of these decisions is found in the January, 1957, issue of the American Bar Association Journal (Vol. 43, p. 55) under the subheading "The Commerce Clause—Then and Now." Among the decisions cited therein are: *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U. S. 1, 81 L. Ed. 893, 57 S. Ct. 615, 108 A. L. R. 1352 (upholding the validity of the Wagner Act under the commerce clause); *United States v. Darby*, 312 U. S. 100, 85 L. Ed. 609, 61 S. Ct. 451, 132 A. L. R. 1430 (upholding the validity of the fair labor standards act under the commerce clause); *United States v. South-Eastern Underwriters Ass'n*, 322 U. S. 533, 88 L. Ed. 1440, 64 S. Ct. 1162 (holding that the insurance business may be regulated by Congress under the commerce clause).

Other examples of acts of Congress, based upon the commerce clause and having a similar effect upon the powers of the states, which have been held valid by the Federal courts are: Securities act of 1933, declared constitutional in *Jones v. Securities & Exchange Comm.*, 298 U. S. 1, 80

L. Ed. 1015, 56 S. Ct. 654; Securities exchange act of 1934, declared constitutional in *Wright v. Securities & Exchange Comm.*, 112 F. (2d) 89 (C.C.A. 1940).

Whatever views one may entertain regarding the effect of these decisions upon powers of the sovereign states, the supreme court remains the final authority on the constitutionality and interpretation of these acts of Congress as well as of the Federal power act. Under Art. VI of the United States constitution, the laws of the United States made in pursuance thereof are declared to be the supreme law of the land, binding on state judges regardless of any state laws or constitutional provisions to the contrary.

Therefore, deeming myself bound by the decisions of the supreme court in the *Appalachian* and *First Iowa* cases, interpreting the Federal power act, I am impelled to dissent from the opinion of the majority in this case.

Without further extending my views, I deem it sufficient to state that, in my opinion, appellant's amended complaint states a cause of action, and that the several answers and cross-complaints herein have not raised a valid defense, for the reasons heretofore given.

My conclusion is that appellant has a valid license issued by the Federal power commission for construction of the Cowlitz project, and that the utility bonds authorized by ordinance No. 14386, as amended, have not been shown to be invalid in any respect.

I would dispose of this case as follows:

The portion of the judgment from which the cross-appeal is taken should be affirmed. On appellant's appeal, the judgment of the trial court should be set aside, and the cause remanded to the superior court with directions to enter a declaratory judgment for appellant in conformity with the views expressed herein. The injunction *pendente lite,* heretofore continued in effect by order of this court, should be dissolved.

MALLERY and FINLEY, JJ., concur with DONWORTH, J.

April 30, 1957. Petition for rehearing denied.